IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRENDA S. EPPS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 11-1462 |
| | ) | Judge Nora Barry Fischer |
| FIRST ENERGY NUCLEAR OPERATING | ) | |
| CO., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.    INTRODUCTION

This employment discrimination case involves allegations by a former employee, Plaintiff

Brenda S. Epps ("Epps") that her suspension from her position as a file and records clerk at

Defendant First Energy Nuclear Operating Company's ("FENOC") Shippingport, Pennsylvania

nuclear power plant in 2009 and later termination after she briefly returned to work in 2010 were

the product of race discrimination.[1]   (Docket No. 1).   Epps further alleges that these employment

actions were made in retaliation for her having filed a charge of race discrimination against

FENOC with the Pennsylvania Human Relations Commission ("PHRC") in 2008.   (Id.).   Her

claims for race discrimination and retaliation allege violations of both Title VII of the Civil Rights

Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA").   (Id.).

Presently before the Court is FENOC's Motion for Summary Judgment.   (Docket No. 23).

FENOC's Motion has been fully briefed by the parties in accordance with Local Rule 56, (Docket

Nos. 23, 25-26, 28, 31-36), the Court heard oral argument from counsel at a hearing on January 11,

---

[1]      The Court notes that Epps has expressly stated that she is no longer pursuing her discrimination and retaliation claims against FENOC as a result of the circumstances surrounding her return from medical leave in 2008. (See Docket No. 33 at n.4).

2013, (Docket No. 38), and accepted supplemental briefing thereafter, (Docket Nos. 39, 40). FENOC argues that Epps has failed to present sufficient evidence to support her claims of race discrimination as she has not identified any comparator employees who were similarly situated to her and treated more favorably by FENOC, and that she has likewise not met her burden to demonstrate that her suspension was casually related to her earlier filing of an EEOC charge, while Epps contends that her claims are properly supported by the evidence of record. Upon consideration of the parties' submissions and for the following reasons, FENOC's Motion [23] is granted.

II.     FACTUAL BACKGROUND

The following facts were compiled from the parties' submissions pursuant to Local Rule 56 and the additional facts of record presented by the parties in conjunction with their supplemental briefs. Unless otherwise specified, the facts of record are uncontested. Viewed in the light most favorable to Epps, they are as follows.

A.     *Epps' Early Work History with FENOC and Predecessor Duquesne Light*

Epps is an African-American female who commenced working at the Shippingport nuclear power plant in 1981. (Docket Nos. 25 at ¶ 6; 34 at ¶ 6). Duquesne Light operated the plant at that time and Epps was an employee of Duquesne Light until FENOC took over the plant in December 1999. (Docket Nos. *Id.* at ¶¶ 5-6). Epps held a number of different positions with Duquesne Light, including: tool room attendant; file and records clerk; word processor; junior stenographer; intermediate clerk; turbine attendant; and mobile maintenance utility worker. (*Id.* at ¶ 7). All of these positions were covered by the Collective Bargaining Agreement between Duquesne Light and the International Brotherhood of Electrical Workers Local 29 ("IBEW Local 29"). (*Id.* at ¶ 8).

2

Epps continued to work at the plant after FENOC's takeover in December 1999, and became an employee of FENOC at that juncture.   (*Id.* at ¶ 9).   She remained employed by FENOC from December 1999 until she was terminated on May 3, 2010.   (*Id.* at ¶ 10).   Epps worked for FENOC as a file and records clerk; tool room attendant; and utility worker/driver.   (*Id.* at ¶ 11).   All of these jobs were union positions and she was represented by IBEW Local 29 throughout her employment with FENOC.   (*Id.* at ¶ 12).

B.      *Unescorted Access Requirements at Shippingport Nuclear Power Plant*

The Nuclear Regulatory Commission ("NRC") provides oversight of the nuclear power plant and has promulgated regulations which must be followed by plant operators, including Duquesne Light and FENOC.   (*Id.* at ¶¶ 14, 15).   The regulations require that the facility be secure and that all employees designated to work in certain areas of the facility have unescorted access authorization at all times.   (*Id.* at ¶15).   As a consequence, all employees at the Shippingport facility must have unescorted access authorization as a condition of their employment with FENOC.   (*Id.* at ¶ 18).   In order to achieve and maintain unescorted access authorization, an employee must be fit for duty, capable of performing his job function and trustworthy.   (*Id.* at ¶¶ 16, 17).

The Access Authorization Department ("AAD") of FENOC is responsible for evaluating all employees to determine whether granting or continuing unescorted access authorization is appropriate.   (*Id.* at ¶¶ 23, 30-31, 35).   Nickolas DiPietro is the FENOC employee who has access responsibility for the Shippingport plant.   (*Id.* at ¶ 35).   FENOC policy provides that an employee's unescorted access can be removed or placed on administrative hold for a number of reasons, including if the employee is: involved in an episode of workplace violence or an altercation with another employee; engaged in activities that raise questions of trustworthiness; on

3

non-occupational illness or injury leave; off work for an extended period of time; working at another site; or fails a fitness for duty test.   (*Id.* at ¶¶ 20-23, 32, 121).

The trustworthiness component of unescorted access requires employees (including those on medical leave) to report any arrests to AAD within 24 hours or the next business day.   (*Id.* at ¶¶ 24-25).   Such an event then triggers an AAD review of the employee's unescorted access.   (*Id.* at ¶ 24).   The fitness for duty component is reevaluated if an employee is involved in any type of incident at work.   (*Id.* at ¶ 26). A fitness for duty test consists of: (1) drug and alcohol testing; and (2) a behavioral observation including a discussion with the medical review officer ("MRO"). (*Id.* at ¶ 28).   The behavioral observation involves not only looking for signs of drug or alcohol abuse but also work-related issues, such as fatigue, which may make an employee unfit for duty. (*Id.* at ¶ 29).

Consistent with NRC regulations, FENOC policy dictates that if an employee's unescorted access is removed, the employee must go through the process to have his or her unescorted access restored before the employee can return to work.   (*Id.* at ¶¶ 30, 31, 33).   The restoration process includes a psychological assessment and the fitness for duty test.   (*Id.* at ¶¶ 32- 33).   AAD officials are permitted to examine an employee's entire access history when making decisions related to the restoration of that employee's unescorted access authorization.   (*Id.* at ¶ 35).   The access history includes all prior discipline of the employee, any actions taken by the company with respect to the employee's unescorted access, the employee's medical history and the employee's criminal record.   (*Id.*).   An employee's unescorted access will not be restored unless FENOC is given reasonable assurance that an employee is fit for duty.   (*Id.* at ¶ 32).

C.    *Relevant FENOC HR Policies on Employee Behavior and Discipline*

FENOC has a number of employee policies which regulate employee behavior in the

workplace. (Docket No. 25 at ¶ 3; 34 at ¶ 3).   Among these policies, FENOC requires that

employees act in a professional manner and thereby expressly prohibits employees from engaging

in violent and harassing behavior toward other employees.   (*Id.*).   The purpose of these policies

is to provide a safe working environment for all employees.   (*Id.*).   The workplace violence

policy, HR Policy 412, states, in relevant part, that:

> Anyone engaging in violent behavior will be subject to discipline, up to and including discharge, and may also be personally subject to other civil or criminal liabilities.
>
> For the purpose of this policy, violent behavior is defined as:
> . . .
> • Loud, angry or disruptive behavior.
> . . .
> • Any other conduct a reasonable person would perceive as constituting a threat of violence. . . .

(Docket No. 31-2 at 11, n.4).   The anti-harassment policy, HR Policy 103, states that:

> It is the policy of the Company to provide a work environment which is free from all forms of unlawful discrimination, including harassment based on race, … [or] gender…. Harassing conduct includes, but is not limited to, any of the following conduct relating to race [or] gender…: Epithets, slurs, negative stereotyping, or threatening, intimidating, or hostile acts…."

(Docket No. 31-2 at 11, n.3).   Violations of employee policies may result in disciplinary action by

the company against the employee.   (Docket No. 25 at ¶ 4; 34 at ¶ 4).   The type of discipline

imposed by the company depends on the circumstances of the violation, and is potentially

wide-ranging including, among other options: written warning letters; coaching; counseling;

suspensions; or terminations.   (Docket No. 34 at ¶ 3).

　　　The collective bargaining agreement between FENOC and IBEW Local 29 provides that

FENOC has a three-year "look back period" which restricts the company to considering only the

prior three years of disciplinary action against the employee when determining the severity of discipline to be imposed for any violation of employee policies. (Docket No. 34 at ¶ 243). FENOC is not permitted to use the employee's entire access history in reaching disciplinary decisions. (*Id.* at ¶ 244). Given same, there are distinct differences between the amount and type of information which may be considered by FENOC in reaching decisions related to discipline and unescorted access. (*Id.*). Additionally, not all discipline imposed on an employee results in the removal of unescorted access and vice-versa. (Docket No. 26-5, Ex. D, *Brosi Depo* at 33).

After a report of employee misconduct is made, an internal investigation is conducted to gather all of the facts. (*Id.* at ¶ 253). The individual tasked with running the investigation interviews all of the employees who were involved in the incident in order to give everyone an opportunity to be heard on the issue. (*Id.*). It is the general practice of the company to permit a union representative to be present when an employee accused of misconduct is interviewed. (*Id.*). The findings of the investigation are summarized and shared with a group of individuals who are ultimately responsible for making the decision about whether an act of misconduct was committed and the discipline for such misconduct, if any, to be imposed. (Docket No. 25 at ¶¶ 126-128; 34 at ¶¶ 126-128). This group may consist of individuals in various departments, including: Legal, Senior Leadership, Human Relations, Industrial Relations, and the supervisor of the accused employee's department. (Docket No. 25 at ¶128; 34 at ¶ 128).

FENOC policy requires that any decisions on employee discipline must be reviewed by the Safety Conscious Work Environment Review Team ("SCWERT"). (Docket Nos. 25 at ¶ 130; 34 at ¶ 130). The purpose of the SCWERT review is to ensure that the recommend action is appropriate and would not create a safety problem at the facility. (Docket No. 25 at ¶ 131; 34 at ¶ 131). The supervisor of the employee presents the facts and circumstances of the alleged actions

and recommended discipline to the SCWERT team.   (Docket No. 26-5, Ex. D at 99).   As a matter of company practice, the director to whom the supervisor reports is not included in the SCWERT team; instead, two directors from other departments who are not in the direct line above the supervisor sit on the review team.   (*Id.*).   Given same, the SCWERT review provides an additional layer of review to make sure that the discipline assessed, if any, is warranted.   (Docket No. 25 at ¶ 131; 34 at ¶ 131).   If the SCWERT team approves the recommended discipline, it is then carried out by the company.   (*Id.* at ¶¶ 131-32).

E.     *Epps' Access History*

As is noted above, an employee's access history includes records concerning: prior discipline, unescorted access authorization, medical history and criminal conduct.   Epps admits that her access history reveals her checkered past, as it contains details of her involvement in multiple instances of harassment and otherwise violent behavior both at work and outside the workplace.   (Docket No. 25 at ¶¶ 36-52; 34 at ¶¶ 36-52).

The first instance of such harassment occurred in 1993, when Epps was accused of harassing another employee and engaging in workplace agitation toward that individual.   (*Id.* at ¶ 36).   Duquesne Light conducted an investigation but ultimately issued only a warning to Epps that any future substantiated actions would result in disciplinary action.   (*Id.* at ¶¶ 37-38).   In December of 1993, Epps was involved in a verbal and physical altercation with a secretary at her daughter's school.   (*Id.* at ¶¶ 42-44).   During this incident, which she initiated due to the fact that her daughter had lost an earring at school, Epps threatened the secretary, used obscene language and then ripped a telephone out of the wall, hitting the secretary in the chin with the telephone in the process.   (*Id.* at ¶ 43).   Epps was cited for disorderly conduct, causing a public annoyance, engaging in threatening behavior and creating a physically offensive condition.   (*Id.* at ¶¶ 42-43).

She was ordered to pay a fine as a result.  (*Id.* at ¶ 44).   After being alerted of this incident, Duquesne Light placed Epps' unescorted access on hold and she was required to complete the access restoration process.   (*Id.* at ¶ 42).   As a part of this process, Epps was evaluated by Dr. Ralph Landefeld and after successfully completing same, her access was restored in July of 1994, at which time she returned to work.   (*Id.* at ¶ 45).

A second internal harassment complaint was made by another employee against Epps in 1995.  (Docket No. 25 at ¶ 39).   Duquesne Light investigated the complaint and Epps was informed that the "longstanding agitation involving [Epps] and other co-workers has caused a considerable disruption of the workforce [and] . . . that future allegations of this type of behavior could result in more severe disciplinary action."  (*Id.* at ¶ 40).   A written warning instructing Epps to avoid engaging in future harassment was placed in her file.  (*Id.* at ¶ 41).

Epps was charged with crimes for her actions outside of the workplace a second time in November of 1999.  (*Id.* at ¶ 46).   In this incident, Epps assaulted a mother and her child at church and she was charged with aggravated assault and reckless endangerment.  (*Id.*).   Her unescorted access was again placed on hold as a result of this incident.[2]  (*Id.*).   She was evaluated by Dr. Landefeld a second time to determine if she could be returned to duty and he recommended that Epps attend formal anger management classes before her access could be restored.   (*Id.* at ¶ 48).   Epps attended eight anger management classes and her access was restored in July 2000, after a period of eight months.  (*Id.* at ¶ 49).

Epps was involved in a third criminal incident in May of 2007 during which she went to a woman's home and harassed her.  (*Id.* at ¶ 50).   She pled guilty and paid a fine.  (*Id.* at ¶ 51).

---

[2]        The Court notes that during this period of time, the Shippingport plant was taken over by FENOC from Duquesne Light. (Docket Nos. 25 at ¶ 9; 34 at ¶ 9).

As is discussed below, Epps was off work on non-occupational leave at this time.   (*Id.* at ¶ 52).

Given same, it appears that no further action was taken by the company concerning her access as a

result of this incident.     (*Id.* at ¶ 56).

> F.     *Epps' Non-Occupational and Medical Leave in 2007-2009 / Return to Work*

In April of 2007, Epps was working in the tool room as a tool room attendant.   (Docket

Nos. 25 at ¶ 55; 34 at ¶55).   Her direct supervisor at that time was Tyrone Turner. (*Id.*).   Epps'

son was tragically murdered in 2007 and she was granted medical leave for a considerable period

of time to address mental health issues.   (*Id.* at ¶¶ 53, 54, 57).   She was eventually deemed to be

fit for regular duty and returned to work on September 17, 2007.   (*Id.* at ¶ 57).   From this time

until February 6, 2009, Epps was off work for medical reasons on several different extended

periods of time.   (*Id.* at ¶¶ 53-84).   Among them, she was off work from: September 21, 2007

through September 26, 2007; November 28, 2007 through November 10, 2008; and, January 27,

2009 through February 6, 2009.   (*Id.*).   During this time, Epps had many interactions with

medical professionals who, at times, opined that she should be limited in her work duties,

including: limiting the number of hours she worked per shift to 10; that she not work at the front

counter of the tool room; that she be taken off of customer service duties or limited to one hour of

such duties per day; and, that she be limited in interactions with large numbers of people.   (*Id.* at

¶¶ 56, 60, 69, 71, 73, 76, 79).

Around March of 2008, Epps also requested that she be removed from the tool room given

the limitations placed on her by the doctors and the fact that she did not get along with her

then-supervisor, Turner.   (*Id.* at ¶¶ 63-67).   Epps was told by Human Resources that it could not

accommodate her as she requested because the limitations were not sufficient to render her unable

to work in the tool room and her prior position in the back of the tool room had been filled.   (*Id.* at

¶ 65).   However, Human Resources advised Epps that she could bid for a clerical position which was open in another department.   (*Id.* at ¶ 66).   Epps refused to do so because the clerical position was for less pay than her tool room position. (*Id.*). FENOC then declined to reinstate her when she was cleared for work as there were no open positions for which she could work with the limitations placed on her by the doctors. (*Id.* at ¶ 72).

On June 24, 2008, Epps filed a charge of discrimination against FENOC with the PHRC alleging race discrimination based on FENOC's refusal to reinstate her in March 2008 while it had allegedly reinstated white employees with medical restrictions.   (Docket No. 25 at ¶ 220; 34 at ¶ 220).   Human Resources ("H.R.") Director Dawn Laitres was aware of Epps' filing of the charge because she was responsible for compiling materials to respond to the administrative agencies. (Docket No. 234 at ¶ 254).   As is noted above, Epps is no longer pursuing this discrimination claim, except to the extent that she claims that her act of filing the charge constitutes a protected activity supporting her retaliation claims.   (*See* Docket No. 33 at n.4).   The PHRC dismissed this charge on May 13, 2011.   (Docket Nos. 25 at ¶ 223; 34 at ¶ 223).

Ultimately, Epps returned to work full time at her previous position as a tool room attendant on February 6, 2009.   (*Id.* at ¶ 83).   She then changed course and successfully bid into the Procedural Control Unit as a file and records clerk and started working in this position on March 2, 2009.   (*Id.* at ¶ 85).   Bruce Mills was the Supervisor of Procedures and Document Control.   (*Id.* at ¶ 13).   Mills became Epps' supervisor after she moved into the Procedural Control Unit.   (*Id.* at ¶¶ 13, 85).   Mills, in turn, reported to Roy Brosi, Director Site Performance and Improvement.   (Docket No. 26-5, Ex. D at 66; Docket No. 25 at ¶ 127).

G.    *November 2009 Incident and Suspension*

At some point, Epps was told by an unnamed employee who was retiring from the Records

Management Center that she could use a pole lamp which was located in his work area after he retired.  (Docket No. 25 at ¶ 86; 34 at ¶ 86).   When the employee retired, the lamp was moved to another work area for storage.  (*Id.* at ¶ 87).   Sometime thereafter, Eleanor Adams, an employee in the Records Management Center, asked her supervisor, Beth Severyn, if the lamp could be used by another Records Management employee.  (*Id.* at ¶ 88).   Ms. Severyn approved Adams' request.  (*Id.* at ¶ 89).   Severyn testified that she declined to provide the lamp to Epps because it belonged to the Records Management Center (rather than Epps' department, the Procedural Control Unit) and it was not the retired employee's property to give to Epps in any event.  (*Id.*).

On the morning of Wednesday, November 18, 2009, Epps went to the Records Management Center at a time when she was supposed to be in another location working at her own job.  (Docket No. 25 at ¶ 90; 34 at ¶ 90).   Epps admits that she was overheard by employee Jewelene Steve yelling profanity about Adams.  (*Id.* at ¶ 91).   Specifically, Epps shouted that she would be looking for Adams because she was "tired of her f'n fat white ass trying to control everything."  (*Id.*).   Later that day, Epps approached another employee, Maureen Brightwell, told her that she was upset with Adams because she went to Supervision about the lamp and then angrily shouted more profanity about Adams.  (Docket No. 25 at ¶ 92; 34 at ¶ 92).

Epps continued her expressions of displeasure with the lamp decision on the next day, Thursday, November 19, 2009.  (*Id.* at ¶¶ 93-94).   At 6:30 a.m., she was standing outside with Foster Johnson.  (*Id.* at ¶ 93).   Epps began discussing the lamp issue with him and again became visibly upset, using additional expletives.  (*Id.*).   Around 7:00 a.m., Epps went to the Records Center and approached employees Holly Straffon and Lynn Bathgate.  (*Id.* at ¶¶ 95-96).   Epps questioned them about rumors regarding the lamp.  (*Id.* at ¶ 96).   She told them that "she was upset with [Adams] for going to Beth Severyn about the lamp because it was none of [Adams']

business."   (*Id.*).

Adams entered the Records Center during this discussion between Epps, Straffon and Bathgate about the lamp.   (*Id.* at ¶ 97).   Adams then told Epps "I'm the one who took the lamp. Your beef is with me [sic] not with Lynn [Bathgate]," and started to explain how Severyn had granted authorization for her use of the lamp.   (*Id.* at ¶ 98).   Epps responded by screaming loudly at Adams.   (*Id.* at ¶ 99).   Epps used profanity and moved toward Adams, yelling in her face. (*Id.*).   As she was screaming, Epps backed Adams up against the high density files in the Records Management Center.   (*Id.* at ¶ 100).

Steve and Sharon Zupo were also in the Records Center during this time.   (Id. at ¶117). Steve unsuccessfully attempted to calm Epps down.   (*Id.* at ¶ 101).   While Epps continued yelling at Adams, Steve ran out of the area and "flew into" the office of Supervisor Beth Severyn. (*Id.* at ¶ 102).   Steve quickly told Severyn that she needed to go to the Records Center because Epps was "out of control."   (*Id.* at ¶ 103).   Severyn dropped everything in her office and ran toward the Records Center.   (*Id.* at ¶¶ 103-05).   As she approached the Records Center, she could hear Epps screaming.   (*Id.* at ¶ 105).   When Severyn entered, she observed that Epps had Adams backed up against the files and was yelling at her.   (*Id.* at ¶ 106).   Severyn testified that Plaintiff was so visibly upset that her veins were sticking out of her neck.   (*Id.* at ¶ 107).

Like Steve, Severyn made attempts to get Plaintiff to stop but was unsuccessful.   (*Id.* at ¶¶ 108-109).   From her perspective, Severyn thought that Plaintiff was exhibiting rage and believed that she was going to hit Adams.   (*Id.* at ¶ 110).   It also appeared to her that the situation was not going to resolve itself.   (*Severyn Depo* at 31).   As a consequence, Severyn did not want to physically intervene and left the area to find additional help to diffuse the situation.   (Docket No. 25 at ¶¶ 110-111; 34 at ¶¶ 110-111).   In fact, Severyn ran to the Telecommunications Department

to summon John Boslijevac, Supervisor of Telecommunications.   (*Id.* at ¶ 112).

All of the commotion in the Records Center attracted a number of other individuals to the area, including Alex Ellis and Dave Lilly from AAD, a security guard and employees Foster Johnson and Mark Benkhart.   (*Id.* at ¶¶ 114-115).   By the time that Severyn and Bosilejevac arrived at the Records Center, the situation had somewhat diffused.   (*Id.* at ¶¶ 113, 116).   At that point, Adams had returned to her work station but Epps remained in the Records Center.   (*Id.* at ¶¶ 113, 116).   Although she was no longer yelling or cursing, Epps was still complaining about the lamp situation and was overheard questioning why Severyn was involved with the lamp decision. (*Id.* at ¶ 116).

Severyn then sent all of the employees in the area, including Epps, Adams, Bathgate, Brightwell, Steve, Straffon and Zupo, to a previously scheduled General Employee Refresher Training.   (*Id.* at ¶ 117).   When the training was completed, AAD was responsible for handling Epps and Adams.   (*Id.* at ¶ 118).   AAD required both to take a fitness for duty test and sent them home pending results of the test.   (*Id.*).   Both were also scheduled for appointments with the MRO the next day and suspended indefinitely.   (*Id.* at ¶ 119-120).   Importantly, Epps' unescorted access was placed on administrative hold pending completion of the access restoration process.   (*Id.* at ¶ 121).   A few days later, Mills presented the indefinite suspension to the SCWERT team and such action was approved.   (Docket No. 34 at ¶ 130).   Epps appeared for her MRO on November 20 with Dr. Michael Kuniak.   (Docket No. 25 at ¶ 143; 34 at ¶ 143).   Dr. Kuniak concluded that Epps had anger management issues and ordered that she complete an employee assistance program ("EAP").   (*Id.* at ¶¶ 143-45).   Her unescorted access remained on hold and she was not released to return to work at this time.   (*Id.* at 145).   On the other hand, Adams was not disciplined, passed her fitness for duty test and quickly returned to work.   (Docket

No. 34 at ¶ 132).

Shortly after the events on November 19, Severyn was tasked with conducting an internal investigation of the incident.   (Docket Nos. 25 at ¶ 122; 34 at ¶ 122).   She interviewed all of the witnesses and took statements from them. (*Id.* at ¶¶ 123-24).   She read the statements back to the witnesses to ensure accuracy.   (*Id.* at ¶ 123).   Severyn then wrote a summary of her investigation and distributed her findings to Epps' Supervisor, Mills; Director Brosi; and Dawn Laitres in H.R. (*Id.* at ¶¶ 126-27).   Epps admits that FENOC's investigation revealed that: she was the aggressor in the incident; pointed her finger at Adams; yelled loudly at Adams, using profanity; Adams was in a defensive position; and Adams was the victim of the intimidating work environment created by her violent actions.   (*Id.* at ¶¶ 133, 144).   However, the internal investigation also uncovered that Epps never physically touched Adams during the altercation.   (Docket No. 34 at ¶ 133).

At the time of the November 19, 2009 incident, Epps had no relevant discipline in her work record given that the company was limited by the CBA to a three year look back period in disciplinary matters.   (Docket No. 34 at ¶¶ 242, 243).   Sometime after the investigation was completed, but before March 9, 2010, a group of individuals including Mills, Brosi, Laitries and representatives of Senior Leadership and the Legal Department discussed the appropriate disciplinary action for Epps.   (Docket Nos. 25 at ¶ 128; 34 at ¶ 128).   After these discussions, it was determined that a thirty (30) day suspension was warranted because of the significance of workplace violence; the facts of the incident which violated both the workplace violence and harassment policies; and the severity of the incident.   (*Id.* at ¶ 129-30).   Mills presented the results of the investigation and the proposed discipline to the SCWERT team, which approved same.   (*Id.* at ¶¶ 131-32).   Epps was then informed that she was suspended for thirty (30) days (from November 19, 2009 through December 19, 2009) and she would remain on unpaid status

14

until her unescorted access was restored.   (*Id.* at ¶ 132).   She was issued a suspension letter on March 9, 2010, setting forth the details of these actions.   (Docket No. 25 at ¶ 129, Pl. Ex. E).

Epps filed a grievance challenging her suspension.   (Docket No. 31 at ¶ 132; 34 at ¶132).  The arbitrator issued a decision on November 21, 2012, concluding that Epps was suspended for just cause because the company proved that the suspension was based on Epps' violation of company policies through her behavior on November 19, 2009.   (*Id.* at ¶¶ 229-30).   The arbitrator also commented that Epps was not treated disparately from Adams because they were not similarly situated given their respective roles in the events (with Epps as aggressor), justifying the differential treatment.   (*Id.* at ¶¶ 229-233).

H.     *Epps' Participation in the Access Restoration Process*

Epps does not contest that her unescorted access authorization remained on hold after she failed the fitness for duty test on November 20, 2009 and until it was ultimately restored on March 15, 2010.   (Docket Nos. 25 at ¶¶ 143-156; 34 at ¶¶ 143-156).   She likewise admits the pertinent facts concerning the steps taken by her and the company related to the restoration process.   (*Id.*).  In addition, as Epps was deemed unfit for duty throughout this period, she could not have returned to work, regardless of any suspension imposed by the company for her actions.   (*Id.* at ¶ 18).

Because Dr. Kuniak's initial evaluation on November 20, 2009 did not result in a finding that there was reasonable assurance that Epps would not engage in similar behavior again, he recommended that Epps complete an EAP and she did so on December 30, 2009.   (*Id.* at ¶¶ 145-46).   The EAP counselor likewise could not conclude that Epps was fit for duty.   (*Id.* at ¶ 147).   As such, it was recommended that Epps undergo a psychological evaluation.   (*Id.* at ¶ 148).   A referral was made to Dr. Tod Marion, a psychologist, for this purpose, upon a recommendation from Dr. Landefeld.   (*Id.* at ¶ 148).

Dr. Marion conducted an evaluation of Epps on February 2, 2010.  (*Id.* at ¶ 150).  He observed that Epps tended to be defensive, often refused to back down from confrontations and believed that others were prejudiced against her.  (*Id.*).   Dr. Marion concluded that Epps "lack[ed] insight into her cognitive behavioral problems" and that it was "unlikely she would be able to control herself without intervention."  (*Id.*).   Upon receiving Dr. Marion's report, Dr. Landefeld consulted with Alex Ellis of AAD, Dr. Kuniak, who had conducted the MRO and Dr. Marion, and determined once again that Epps was not fit to return to duty at that time.  (*Id.* at ¶¶ 151-52).   His conclusion rested on Epps' repeated confrontational actions and lack of insight as to the wrongfulness of her behavior.  (*Id.* at ¶ 152).   Dr. Lendefeld then recommended that Epps undergo another evaluation by Dr. Constance Fischer,[3] a clinical psychologist, in Pittsburgh.  (*Id.* at ¶ 152).

Dr. Fischer conducted a psychological assessment of Epps on February 27, 2010.  (*Id.* at ¶ 155).   She then prepared a report and shared it with FENOC on March 15, 2010.  (Id. at ¶ 155). Dr. Fischer recommended that Epps' unescorted access be restored.   (Docket No. 26-6 at 32-34). However, as part of her evaluation, she advised Epps that her nuclear clearance would likely not be continued if any further disturbances occurred.  (*Id.*).   Dr. Fischer also presented Epps with a series of exercises that she could use to avoid future confrontations and Epps was receptive to same.  (*Id.*).   After the report was received, Dr. Lendefeld recommended to the company that Epps' unescorted access be reinstated.   (Docket Nos. 25 at ¶ 156; 34 at ¶ 156).   He also suggested that Epps be given a last chance agreement.   (*Id.*).

I.     *Epps' Return to Work*

FENOC accepted the recommendations from Doctors Lendefeld and Fischer, and Epps'

---

[3]     The undersigned notes that she has no familial relation to Dr. Constance Fischer.

unescorted access and pay were restored as of March 15, 2010. (Docket Nos. 25 at ¶¶ 157, 160; 34 at ¶¶ 157, 160). Epps had also met all other necessary requirements to return to work and the company felt that she should be returned to her prior position in the tool room. (*Id.* at ¶¶ 157-160). FENOC did not believe that transferring Epps to another position or department was necessary or appropriate. (*Id.* at ¶¶ 158-59).

In late March of 2010, a number of employees who were witnesses to the November 2009 incident learned that Epps was scheduled to return to work and expressed concerns to FENOC that they were not comfortable with Plaintiff returning to work. (Docket Nos. 25 at ¶¶ 137-42; 34 at ¶¶ 137-42). Steve and Straffon both spoke directly to Mills, who advised them that Epps had a right to return to work as she had been cleared to return. (*Id.* at ¶ 137). Zupo, Brightwell, Straffon, Bathgate and Adams completed an employee concerns program form and stated that they were concerned for their safety. (*Id.* at ¶ 138). Bathgate also met personally with Darrel Batina, an employee concerns representative, to further express her trepidation. (*Id.* at ¶ 139). Laitres testified that she was not aware of the employees' submissions to Employee Concerns because they are confidential, but she was approached by a representative from that department who questioned what FENOC was doing to protect employees. (*Id.* at ¶ 140). Brosi and Severyn likewise testified that they were aware that employees were not comfortable with Epps returning to work. (*Id.* at ¶¶ 141-42).

Epps returned to work on April 1, 2010. (*Id.* at ¶ 161). She was not required to sign a last chance agreement at that time. (Docket No. 34 at ¶ 156). Instead, Epps and a union representative attended a meeting with Laitres of H.R. and her Supervisor, Mills. (Docket Nos. 25 at ¶ 162; 34 at ¶ 162). During the meeting, Epps was read a letter dated April 1, 2010 from Director Brosi outlining the discipline imposed (i.e., the suspension from November 19, 2009

through December 19, 2009 and unpaid time off while her unescorted access was on hold) and the company's expectations of her future behavior as she returned to the workforce. (*Id.*). The letter indicated that Epps' actions on November 19, 2009 created an intimidating workplace environment and had violated company policies against workplace violence and harassment. (*Id.* at ¶¶ 162-63). Epps was also advised that such conduct would not be tolerated in the future and that failure to adhere to the requirements of the letter could result in suspension or immediate termination. (*Id.*). Epps was further told that she was expected to act professionally at all times, be respectful of her co-workers and be cooperative. (*Id.* at ¶ 162). Epps did not ask any questions concerning the terms of the letter during the meeting and indicated that she understood same. (*Id.* at ¶ 165). However, she did ask if she could take a half-day of vacation for the rest of the day, April 1, and a full day of vacation on the next day, Friday, April 2. (*Id.* at ¶ 167). Both requests were granted by the company. (*Id.*). Epps also designated her start time as 8:00 a.m. pursuant to a policy which permitted employees to flex their designated start times between 7:00 a.m. and 8:30 a.m. (*Id.* at ¶¶ 168-69).

Epps did not return to work until Wednesday, April 14, 2010 because she was granted bereavement leave from April 5, 2010 through April 9, 2010 due to the death of her father and the company authorized her to use vacation days on April 12 and 13, 2010. (*Id.* at ¶¶ 170-72). On April 14, Epps called her supervisor, Mills, five minutes before she was scheduled to start work at 8:00 a.m. and asked that she be permitted to come in at 8:30 a.m., which was granted. (*Id.* at ¶ 173). When she arrived at work, Mills sought out Epps and asked if she wanted to change her start time permanently, to which she responded no and further told him that her start time would not be a problem going forward. (*Id.* at ¶ 174). However, on Thursday, April 15, 2010, Epps again called Mills five minutes before she was scheduled to start her shift and requested that she be

permitted to take a convenience day.   (*Id.* at ¶ 175).   Epps then took a personal day on Friday, April 16, 2010.   (*Id.* at ¶ 176).

    J.    *April 19, 2010 Incident and Epps' Termination*

Epps arrived ten minutes late for work on Monday, April 19, 2010.   (*Id.* at ¶¶ 177-78). Mills approached Epps and requested that she go get her union representative, Paul Thomas, so that they could discuss her tardiness issues.   (*Id.* at ¶ 179).   Mills then left his office and saw Thomas.   (*Id.* at ¶ 180).   Mills stopped Thomas and told him that he would give him time to discuss the tardiness issue with Epps before returning.   (*Id.*).   When Thomas initially met with Epps, she asked him to accompany her to go speak with one of her co-workers, Sharon Zupo, about their friendship and Thomas agreed.   (*Id.* at ¶¶ 181-82).   Epps believed that she and Zupo were no longer friends and that Zupo should not have pictures of Plaintiff's family and dog on the wall of her cubicle.   (*Id.* at ¶ 182).

Epps and Thomas then walked toward Zupo's cubicle, which was located in an area outside of Epps' designated work area.   (*Id.* at ¶¶ 184, 186).   Zupo was not aware that Epps wanted to speak with her and was sitting with her back towards Epps and Thomas when they arrived.   (*Id.* at ¶¶ 183-84).   Thomas spoke first and told Zupo that Epps wished to speak with her.   (*Id.* at ¶188). Epps started questioning Zupo about why she did not call Epps while she was off work from November 19, 2009 through April 1, 2010.   (*Id.* at ¶ 189).   Epps proceeded to grab pictures off of the wall of Zupo's cubicle.   (*Id.* at ¶ 190).   Zupo did not explicitly grant Epps permission to take the pictures, although Epps testified that she believed she had permission to do so.   (*Id.*).   After taking the pictures and while she was still standing at the cubicle, Epps ripped apart the picture of her dog and threw it in the garbage can.   (*Id.*).   At this point, Thomas felt that the situation was escalating and directed Epps to leave the cubicle, to which she complied.   (*Id.* at ¶ 191).

Zupo went to the office of her supervisor, Severyn and reported the incident.   Severyn testified that Zupo was shaking and visibly upset.   (*Id.* at ¶ 192).   Severyn informed Epps' supervisor, Mills of the incident.   (*Id.* at ¶ 193).   Mills then met with Zupo individually and held a second meeting with Epps and Thomas, to get all sides of the story.[4]   (*Id.* at ¶¶ 193-94).   He took notes during these meetings and typed them up after the meetings had concluded.   (*Id.* at ¶¶ 195-96).   During her meeting with Mills, Epps indicated that she was done with the meeting and was going to leave.   (*Id.* at ¶ 197).   Thomas instructed her that she could not leave because it was a serious discussion with her supervisor.   (*Id.*).   Epps was then sent to AAD for a fitness for duty test.   (*Id.* at ¶ 198).   Later, Mills and Brosi discussed the incident and agreed that Epps' actions had violated the terms of the April 1, 2010 letter.   (*Id.* at ¶ 199).

Almost immediately following the incident, at 10:35 a.m., Zupo sent an email to Severyn explaining her version, as follows:

> On Monday, April 19, 2010, approximately 9:45, Brenda Epps came to my cubicle escorted by Paul Thomas.   She wanted pictures of her dog that she gave me which were on my wall.   She proceeded to go around me and grab the pictures off my wall and ripped them up.   I guess she was referring to the time she's been off; communicating this to me in an intimidating and hostile voice. I calmly told her I don't call people that call me a "white bitch" (which was overheard during the incident with Eleanor – she referred to us all as white bitches).   She yelled "I didn't call you a bitch – your husband calls you worse than that!" and stomped out of my cube with Paul.

(Docket No. 26-7).

Laitres was assigned to investigate the incident.   (Docket Nos. 25 at ¶ 200; 34 at ¶ 200). Laitres met with Zupo and Thomas but did not interview Epps.   (*Id.* at ¶¶ 200-207).   Instead,

---

[4]        The parties dispute whether Severyn was in attendance at these meetings.   (Docket No. 25 at ¶ 193; 34 at ¶ 193).   This dispute is not material to the decision on the pending motion for summary judgment.

Laitres testified that she relied on Mills' notes from his meeting with Epps to determine her version of the events.  (*Id.* at ¶ 206).  Laitres also received information about the incident from other employees, including Joanne Williams, who sent an email to Laitres on April 19, 2010, describing what she had observed.  (*Id.* at ¶ 202).  Laitres met with Zupo on April 20, 2010 and she explained that Zupo was very upset during this meeting and told her that she was unable to sleep over the incident.  (*Id.* at ¶ 203).  Zupo told Laitres during the meeting that Epps ripped the pictures off of her wall before she was able to say anything to her.  (*Id.*).  From his perspective, Thomas told Laitres that Epps removed the pictures from the wall, tore one up and threw it in the garbage can, while simultaneously exclaiming to Zupo, "[w]hat kind of friend are you?  You called me before concerned about my son but you don't call me when I'm off?  I guess we are no longer friends."  (*Id.* at ¶ 204).  Thomas then intervened by grabbing Epps and removed her out of the cubicle, telling her "you're lucky you're not getting fired over that."  (*Id.* at ¶ 204).  Thomas also expressed to Laitres that the incident should not have happened.  (*Id.* at ¶ 205).  Laitres believed that Thomas had always defended Epps in prior situations, but was forthcoming, honest and upset about the latest incident.  (*Id.* at ¶¶ 206-07).

A number of employees expressed concerns to FENOC about Epps' conduct during the April 19 incident.  (Docket No. 25 at ¶¶ 210-13; 34 at ¶¶ 210-13).  On April 20, 2010, Straffon emailed Darrel Batina in Employee Concerns and expressed that she was concerned for her safety and the safety of others due to Epps' hostile actions, which occurred so soon after she had returned to work full time from her suspension for the last incident.  (*Id.* at ¶¶ 210).  Straffon also met with Laitres in person and told her that she was officially complaining to FENOC about Epps' behavior because she was afraid for her safety.  (*Id.* at ¶ 211).  Straffon explained that she was a witness to the November 19, 2009 incident involving Epps, as was Zupo, and now believed that Epps was

"coming after" all of the "girls" who were present for that incident and had given statements to the company.  (*Id.*).   She further explained that she was considering going to the police to report the incident.  (*Id.*).   Zupo's husband, Ralph, also contacted Laitres and told her that his wife was having a difficult time dealing with the incident and wanted to call off of work so that she did not have to face anything at work.  (*Id.* at ¶ 212).   Finally, Adams emailed Laitres and Batina and similarly expressed concerns for her own safety now that Plaintiff had returned to work and was involved in the incident with Zupo.   (*Id.* at ¶ 213).

Laitres completed her investigation and then conferred with Brosi and Mills.  (*Id.* at ¶¶ 214-15).   Collectively, they determined that Epps' actions were confrontational and violated the expectations of her conduct as set forth in the April 1, 2010 letter which was given to Epps and read to her on that date.  (*Id.* at ¶ 215).   The findings of the investigation were that Epps had confronted a co-worker, ripped up a picture in an aggressive manner and created an intimidating work environment.  (*Id.*).   Further, she took all of these actions in the presence of her union steward.  (*Id.*).   On April 22, 2010, Mills presented the findings to SCWERT and recommended that Epps be terminated.  (*Id.* at ¶ 217; *Mills Depo* at 128-29).   This recommendation was accepted by the company.  (Docket No. 35-8. Pl. Ex. H).

The next day, on April 23, 2010, Zupo sent the following email to Laitres in H.R., Batina in Employee Concerns, and Ellis in AAD.

> It is my heartfelt plea to the Company and Union that Brenda Epps not be terminated at this time.   Is [sic] is all over site now that Brenda has been fired because of an argument with me.   This is taking a heavy toll on my physical and mental well being.   There was no argument and the confrontation would normally not have led to a termination, but this is the way it will be portrayed and it is not fair at all to me.   I have been a very good employee over the years and don't deserve to have this hanging over me, especially when my Union instigated it.   I am pleading that she be sent back to a place

> other than the SEB Building like we requested after the first
> confrontation.   I, personally, don't want to have someone's
> termination on my head when I had nothing to do with it.   This is
> totally unfair to me.   I would appreciate your understanding in this
> matter.

(Docket No. 35-11 at 2, Pl. Ex. K).   Because this email had yet to be sent to management, Mills

did not present it to SCWERT during the meeting on the prior day, April 22, 2010.

On May 3, 2010, Epps was sent a letter from the company notifying her that her

employment was terminated.   (Docket No. 25 at ¶ 219; 34 at ¶ 219).   The company expressed

that Epps' termination was based on her violation of the terms of the April 1, 2010 letter.   (Docket

No. 34 at ¶ 252).   The letter does not state that Epps was terminated for a second violation of the

workplace violence policy; however, Brosi testified that Plaintiff's conduct on April 20, 2010

likely would have violated the policy.   (Docket No. 34 at ¶ 252; Def Ex. K, *Brosi Depo* at

115-16).

K.     *Evidence of Alleged Comparators*

Epps initially claimed in her Complaint that the individuals with whom she was involved in

confrontations on November 19, 2009 and April 19, 2010, Adams and Zupo, were appropriate

comparators, as both are Caucasian and were not disciplined by FENOC as a result of those

incidents.   (Docket No. 1).   She has since abandoned those claims and now argues that

appropriate comparators are Caucasian employees, Scott Coleman, Richard Allen and Brian

Malloy because FENOC admits that these three individuals violated the workplace violence policy

while employed by FENOC.   (*See generally* Docket No. 33).

Scott Coleman violated the workplace violence policy during an incident which occurred

on April 26, 2005.   (Docket No. 34 at ¶¶ 245, 247).   He was an employee of the Records

Management Center at the Shippingport plant and his direct supervisor was Severyn at that time.

(Def. Ex. J, *Severyn Depo* at 69).   Coleman was involved in a loud verbal confrontation with

another employee during which he "threw a book down" or "something like that."   (Docket No.

34 at ¶ 245).   The company investigation found that Coleman had "exhibited inappropriate,

unprofessional behavior" and that he was "extremely loud, angry and disruptive of [his] peers."

(*Id.* at ¶ 247).   Coleman was not suspended for his behavior; instead, he was ordered to attend an

anger management evaluation.   (*Id.* at ¶ 246).   Severyn advised Coleman that:

> The behavior you exhibited clearly compromises the workplace and
> you are urged to take this opportunity to improve on your behavior.
> This letter is to inform you that any future incidents of this nature or
> any other matter concerning your performance as an employee may
> result in further disciplinary action including, and up to,
> termination.

(Pl Ex. L).   Coleman followed up this incident by failing a random drug test on October 6, 2005.

(Docket No. 34 at ¶ 248; Pl Ex. M.).   He was not terminated after this second incident, despite

having a long history of disciplinary problems in his employment record.   (Docket No. 34 at ¶¶

249-50).   The discipline imposed on Coleman included that he was placed on non-occupational

illness and injury leave on October 6, 2005 and, although the record is unclear, it appears that he

returned to work on December 8, 2005.   (Pl Ex. M).

Brian Malloy was an analyst in the Chemistry Department at the Shippingport plant.

(Docket No. 34 at ¶ 237; Def. Ex. I, *Laitres Depo* at 76).   Malloy violated the workplace violence

policy at some point after 2007 but before 2009.   (*Id.*).   The precise date of the incident involving

Malloy is not in the record although Laitres testified that it had occurred closer to 2007. (Def. Ex.

I., *Laitres Depo* at 77).   Laitres was not personally involved in the investigation into this incident

but was consulted as to the findings of the investigation.   (*Id.* at 78).   As to the details of the

incident, Laitres explained that Malloy was involved in a heated discussion with a co-worker

during which he "mouthed off," swore, used some vulgarity, and might have touched or pushed the

co-worker.   (Docket No. 34 at ¶ 238).   Laitres further testified that: the other individual involved

in the incident did not report it; there were no other employees involved who attempted to stop the

incident; security was not called; supervisors were not involved; and no co-workers reported

concerns following his behavior.   (Def. Ex. I., *Laitres Depo* at 78).

Malloy was suspended for one day as a result of his conduct.   (Docket No. 34 at ¶ 239).

The reason for the discipline imposed was that the company:

> needed to send a message to Brian, that even though he allegedly
> had some reason for it and it was a quick spur-of-the-moment thing,
> it would not be tolerated by the company and that's why we went
> directly to a suspension versus a counseling coach, written warning
> letter, anything like that, we felt that it warranted a suspension.

(*Id.* at ¶ 240).   Prior to this incident, Malloy had no relevant discipline in his employment record,

but the company "felt that the infraction itself was such that it would warrant an immediate

suspension."   (*Id.* at ¶ 241).

Richard Allen also violated the workplace violence policy while he was working at the

Perry, Ohio plant on a resource sharing assignment.   (Def. Ex. I, *Laitres Depo* at 61-62).   At that

time, he reported to supervisors at the Perry plant, rather than the Shippingport plant.   (*Id.* at 62).

The specifics of the incident are not in the record except that it was an "altercation" with a

co-worker which violated the workplace violence policy.   (Docket No. 34 at ¶ 251).   Allen was

not disciplined for his actions because of an insufficient investigation.   (*Id.*).

III.   PROCEDURAL HISTORY

Epps initiated this action against FENOC by filing a charge alleging race discrimination

and retaliation with the EEOC on July 26, 2010, and later cross filing the same with the PHRC.

(Docket No. 1 at ¶ 30).   Following her receipt of her right to sue letter on August 23, 2011, Epps

filed a Complaint in this Court on November 15, 2011. (Docket No. 1 at ¶ 31). On February 24, 2012, FENOC responded by filing its Answer. (Docket No. 4).

After receiving two extensions of time from the Court, the parties completed fact discovery on September 25, 2012.[5]   (Docket Nos. 17-20).   On November 5, 2012, FENOC filed a Motion for Summary Judgment with a motion for leave to file excess pages for its supporting brief, its Concise Statement of Undisputed Material Facts, and its supporting Appendix of Exhibits. (Docket Nos. 23, 24, 25, 26).   The next day, on November 6, 2012, FENOC filed its Brief in Support of its Motion for Summary Judgment after the Court granted its motion to file excess pages. (Docket Nos. 27, 28). After receiving leave of court, FENOC filed a supplement to its concise statement of facts and supporting brief on November 29, 2012. (Docket Nos. 29-32). On December 5, 2012, Epps filed a Brief in Opposition to FENOC's pending motion, as well as her Counterstatement of Undisputed Material Facts and Additional Material Facts, and her Appendix of Exhibits in support. (Docket Nos. 33, 34, 35). On December 19, 2012, FENOC replied to Epps' memorandum opposing its motion for summary judgment. (Docket No. 36).

The Court heard oral argument from counsel at a motion hearing on January 11, 2013. (Docket No. 37).   The hearing has been transcribed and the parties' arguments at the hearing have been considered by the Court.   (Docket No. 38).   The parties requested leave of court to submit supplemental briefing and both submitted their supplemental briefs on February 21, 2013. (Docket Nos. 39, 40).   As all briefing has now concluded, FENOC's motion is fully briefed and ripe for disposition.

---

[5]       In the interim, the parties and counsel participated in mediation with Sally Griffith Cimini, Esquire, but the case was not resolved.   (Docket No. 16).

IV.    LEGAL STANDARD

The legal standard governing motions for summary judgment is well-settled.    To this end,

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).[6]   Pursuant to Rule 56, the Court must enter summary judgment

against the party "who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).    A motion

for summary judgment will only be denied when there is a genuine dispute of material fact, i.e., if

the evidence is such that a reasonable jury could return a verdict for the non-moving party.

*McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).    The mere existence of some disputed

facts is insufficient to defeat a motion for summary judgment.    *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).    As to materiality, "[o]nly disputes

over facts that might affect the outcome of the suit under the governing law will properly preclude

the entry of summary judgment." *Id.* at 248.

In determining whether the dispute is genuine, the Court's function is not to weigh the

evidence, to determine the truth of the matter, or to evaluate credibility.    Rather, the Court is only

to determine whether the evidence of record is such that a reasonable jury could return a verdict for

the non-moving party.    *McGreevy*, 413 F.3d at 363; *see also Simpson v. Kay Jewelers*, 142 F.3d

639, 643 n.3 (3d Cir. 1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994)).    In

---

6        Rule 56 was amended effective December 1, 2010. The explanatory notes to the 2010 amendments explain that while the language in Rule 56 was changed from "issue" to "dispute," the "standard for granting summary judgment has not changed." Thus, the Court considers binding prior jurisprudence of the United States Supreme Court and the United States Court of Appeals for the Third Circuit in arriving at the standard to be employed in addressing the instant motions.    *See Toney v. Bledsoe*, 427 F. App'x 74, n. 5 (3d Cir.2011) (not precedential) (same).

evaluating the evidence, the Court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor.   *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

V.   DISCUSSION

FENOC argues that there are no genuine disputes of material facts and that it is entitled to summary judgment as to Epps' race discrimination and retaliation claims.   (Docket Nos. 28, 36, 40).   FENOC contends that the evidence submitted by Epps is insufficient to demonstrate that she was suspended or terminated on the basis of her race or as retaliation for her previously having filed a charge against the company alleging discrimination with the PHRC.   (*Id.*).   In opposition, Epps maintains that she has presented sufficient evidence supportive of her claims to defeat FENOC's motion.   (Docket No. 33, 39).   To this end, Epps believes that the evidence that she has put forth shows that the discipline she received (i.e., the suspension and termination) was in excess of the discipline imposed on Caucasian employees for engaging in similar conduct which also was deemed to have violated FENOC's workplace violence policy.   (*Id.*).   The Court will first address the parties' positions with respect to the race discrimination claims and then analyze the retaliation claims.

A.   *Discrimination Claims*

Epps has brought race discrimination claims against FENOC under Title VII and the PHRA, both of which prohibit employers from discriminating against employees on the basis of the employee's race.   *See* 42 U.S.C. §2000e-2(a)[7]; *see also* 43 P.S. § 955(a).[8]   It is well-settled

---

[7]   Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ..." 42 U.S.C. § 2000e-2(a)

28

that claims under Title VII and the PHRA are analyzed under the same general framework at the summary judgment stage.  *See Dellapenna v. Tredyffrin/Easttown Sch. Dist.*, 449 F. App'x 209, 213, n.2 (3d Cir. 2011) (citing *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 409 (3d Cir. 1999)).  Epps admits that she has no direct evidence of race discrimination; thus, the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) is applied.   Under *McDonnell Douglas*, Epps has the initial burden to establish a *prima facie* case of discrimination.  *Warfield v. SEPTA*, 460 F. App'x 127, 129-30 (3d Cir. 2012) (citing *Jones*, 198 F.3d at 410-11).

> In order to establish a prima facie case of discrimination, a plaintiff must show that: (1) she is a member of a protected class; (2) she is qualified for the position; (3) she suffered an adverse employment action; and (4) similarly situated persons who are not members of her protected class were treated more favorably or that the circumstances of her termination give rise to an inference of discrimination.

*Warfield*, 460 F. App'x at 129-30 (citing *Jones*, 198 F.3d at 410-11).   If Epps establishes a *prima facie* case, the burden shifts to FENOC "to offer a legitimate, non-discriminatory reason" for its employment decisions and, if FENOC is successful, the burden shifts back to Epps to present sufficient evidence from which a reasonable jury could conclude that the employment decision was a pretext for discrimination.  *Id.*

At the outset, the Court notes that Epps has narrowed her case during summary judgment proceedings and now challenges only two discrete employment actions, i.e., her suspension for her actions during the November 19, 2009 incident, and her termination which resulted from the April

---

[8]      The PHRA provides that "[i]t shall be an unlawful discriminatory practice ... [f]or any employer because of the ... race ... of any individual ... to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual, or to otherwise discriminate against such individual ... with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract."   43 P.S. § 955(a).

19, 2010 incident.[9]   (*See* Docket No. 33 at n.4).   With that concession, the parties do not dispute

that Epps has presented sufficient evidence to establish the first three elements of her *prima facie*

case because: (1) she is African-American and a member of a protected class; (2); she was

qualified for her former position as a file and records clerk; and, (3) her suspension and termination

constitute adverse employment actions.   (Docket No. 40 at 2).   The contested issue between the

parties is whether Epps has met her burden on the fourth element to produce sufficient evidence

from which a reasonable jury could infer that similarly situated persons outside of the protected

class or comparators were treated more favorably than she.[10]

"[T]he question of whether other employees are similarly situated is fact-intensive." *Sims*

*v. Court of Common Pleas of Allegheny County*, No. 10-151, 2010 WL 3896428, at *4 (W.D. Pa.

Sept. 30, 2010).   At the summary judgment stage, the burden rests with Epps to demonstrate both

that she and her chosen comparators are "similarly situated" and that the company treated them

more favorably than she.   *See Warfield*, 460 F. App'x at 130.   "Though 'similarly situated' does

not mean 'identically situated,' a plaintiff must demonstrate that she is similar to the alleged

comparator in relevant respects." *Id.* (quoting *Kosereis v. Rhode Island*, 331 F.3d 207, 214 (1st

Cir. 2003)).   The focus on whether the comparators were treated more favorably focuses "on the

particular criteria or qualifications identified by the employer as the reason for the adverse action."

*Simpson v. Kay Jewelers*, 142 F.3d 639, 647 (3d Cir. 1998); *see also Warfield*, 460 F. App'x at 130

---

[9]      Given that Epps has not defended the motion for summary judgment as to her claims raised in her Complaint that FENOC's refusal to reinstate her to her position in March of 2008 was discriminatory, summary judgment will be granted for FENOC on those claims.

[10]      The Court recognizes that the fourth element may also be established by presenting evidence of a "causal nexus between the harm suffered and the plaintiff's membership in a protected class, from which a reasonable juror could infer, in light of common experience, that the defendant acted with discriminatory intent." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 275 (3d Cir. 2010).   Epps has proceeded to attempt to meet her burden at summary judgment based only on comparator evidence and therefore has not pursued her claims in light of *Anderson* and under the second clause of the fourth element of her prima facie case.   (*See* Docket Nos. 33, 39).   This Court's review of the evidence is such that her case would fail under this rationale as well, had she pursued such arguments.

(quoting same).

> Context matters in assessing the factors relevant to the inquiry of whether two employees are similarly situated. In this particular context—workplace disciplinary and/or personnel actions—relevant factors include a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."

*McCullers v. Napolitano*, 427 F. App'x 190, 195 (3d Cir. 2011) (quoting *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000)) (citation omitted); *see also Nguyen v. AK Steel Corp.*, 735 F. Supp. 2d 346, 361 (W.D. Pa. 2010) (recognizing same general legal principles).

Considering these legal principles, the Court now looks to the record evidence as to each of the two challenged adverse employment actions, in turn.

    1.    <u>Suspension Resulting from November 19, 2009 Incident</u>

        a.    Insufficient Evidence to Establish Plaintiff's *Prima Facie* Case

With respect to her suspension in November of 2009, Epps contends that the appropriate comparators are white FENOC employees Brian Malloy, Scott Coleman and Richard Allen. (Docket Nos. 33, 39). She suggests that these individuals engaged in similar conduct and were also found to be in violation of the FENOC workplace violence policy but were not disciplined as severely as she was for her own actions. (*Id.*). FENOC counters that all three of these individuals are not similarly situated to Epps because they were employed in different departments, held different positions, and reported to different supervisors. (Docket Nos. 36, 40). FENOC further maintains that Epps has failed to establish that these individuals were treated more favorably than she was because she engaged in more serious conduct than them; was found to have violated both the workplace violence and harassment policies while the comparators violated only

the workplace violence policy; and did not have their unescorted access placed on hold as Epps did.  (*Id.*).   The Court agrees with FENOC that Epps has failed to meet her burden to demonstrate that the chosen comparators are similarly situated or were treated more favorably by FENOC.

In this Court's estimation, Epps has failed to present sufficient facts from which a reasonable jury could conclude that she was similarly situated to Coleman, Malloy or Allen and thus the evidence that she has proffered showing that she was disciplined more severely than them cannot raise a reasonable inference of race discrimination.   The relevant factual inquiry to determine if employees are similarly situated in a discipline case includes whether: the employees worked in the same department; held similar positions; reported to the same supervisor; were subject to the same policies; and engaged in similar offending conduct.   *See e.g., Mandel v. M & Q Packing Corp.*, 706 F.3d 157, 170 (3d Cir. 2013); *McCullers*, 427 F. App'x at 195; *Warfield*, 460 F. App'x at 130.   The United States Court of Appeals for the Third Circuit recently reiterated these principles in *Mandel v. M & Q Packing Corp.*, holding that "[a]lthough the identification of a similarly situated individual outside of the protected class, who engaged in the same conduct but was treated more favorably, may give rise to an inference of unlawful discrimination, an employee who holds a different job in a different department is not similarly situated." *Mandel*, 706 F.3d at 170 (citing *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 358–59 (3d Cir. 1999)).   By way of further example, in *Nguyen v. AK Steel Corp.*, 735 F. Supp. 2d at 367, Chief Magistrate Judge Lehihan of this Court found that the plaintiff met his burden to demonstrate that he was similarly situated to four other employees because they: worked in the same department at the same facility; were supervised by the same individual; were similarly charged with intentionally stealing company property; and participated in the same grievance proceedings before the same individuals.   The facts of this case are distinguishable from *Nguyen* and are insufficient to meet

32

the prevailing standards.   Here, the undisputed facts establish that Epps and all three of the supposed comparators held different positions, worked in different departments and reported to different supervisors.   (Docket Nos. 25 at ¶¶ 13, 83, 85, 127; 34 at ¶¶ 23, 83, 85, 127, 237, 245, 247, 248; Def Ex. I at 61-62, 76; Def Ex. J at 69).   Thus, even though they were all subject to the workplace violence policy in their respective roles and assuming that they had each engaged in similar conduct, the differences in their positions, departments and supervisors make clear that they are not similarly situated to Epps.   *See Mandel*, 706 F.3d at 170.

To this end, the undisputed evidence is that Epps' former position was as a file and records clerk, a bargaining position covered by the CBA.   (Docket Nos. 25 at ¶ 85; 34 at ¶ 85).   She worked in the Procedural Control Unit at the Shippingport plant.   (*Id.*).   Her direct supervisor was Mills, who reported to Director Brosi.   (*Id.* at ¶¶ 13, 85; Docket No. 26-5, Def. Ex. D at 66).   In contrast, Malloy was a chemical analyst who worked in the Chemistry Department at the Shippingport plant.   (Docket No. 34 at ¶ 237; Def. Ex. I at 76).   As such, he reported to a different supervisor in a separate department.[11]   (*Id.*).   Meanwhile, Allen did not even work at the

---

[11]      Epps makes much of her position that the conduct engaged in by Malloy was more severe than her conduct. (*See* Docket Nos. 33, 39).   Malloy was alleged to have engaged in a verbal argument that escalated to the point of his pushing or touching a co-worker. (Docket No. 34 at ¶ 238).   Epps points out that she did not touch Adams during their November 19, 2009 altercation, although she admits that she screamed loudly in her face, backed her up against file cabinets and acted in a violent and intimidating fashion.   (*Id.* at ¶¶ 133, 144).   FENOC argues that Epps' conduct was more serious than Malloy's given the significant disturbance caused by Epps' actions and the co-workers' fearful response to her continued working at the plant.   (Docket No. 36).   While the parties have identified some factual disputes in this regard, the Court finds that these issues are not material disputes sufficient to defeat the motion for summary judgment because under Third Circuit precedent, including *Mandel*, the considerable differences in Plaintiff and Malloy's titles, departments, and supervisors preclude a finding that they are similarly situated.   *See Mandel*, 706 F.3d at 170.
        Epps further argues that the record evidence also shows that H.R. representative Laitres was involved in the decision-making process in the situations involving both her and Malloy's cases.   (Docket Nos. 33, 38, 39).   However, Laitres had no supervisory responsibility over these employees but merely performed her position in human resources and participated – along with the employees' direct supervisors and other management-level staff—as a member of the group involved in the decision-making process. The decisions recommended by this group of individuals were then subject to scrutiny by the SCWERT review team, which had to approve the employment actions. As Laitres was not the sole, final decision-maker or Epps' direct supervisor, her involvement in her H.R. role is not enough to defeat summary judgment.   *See Mandel*, 706 F.3d at 170.   Finally, as is addressed in further detail in §

Shippingport plant at the time he was alleged to have violated the workplace violence policy but was working on a resource sharing assignment at the Perry, Ohio plant.   (Def. Ex. I. at 61-62). He likewise was necessarily working in a different department and reporting to a supervisor at that facility rather than someone at the Shippingport plant in Pennsylvania.   (*Id.*).   For these reasons, neither Malloy nor Allen is an appropriate comparator. *See Mandel*, 706 F.3d at 170.

Epps is correct that her title, position and supervisor most closely align with those of Coleman.   However, they remain distinct.   Coleman worked as an employee in the Records Management Center, which is a separate department than the Procedural Control Unit where Epps worked.   (Def. Ex. J at 69).   Coleman's direct supervisor was Severyn rather than Mills, who supervised Epps.[12]   (*Id.*).   The Court recognizes that the undisputed evidence shows that these departments, while separate, were located in the same building and within walking distance to each other.   (Docket Nos. 25 at ¶¶ 184, 186; 34 at ¶¶ 184, 186).   In addition, the incidents of workplace violence engaged in by Epps and Coleman appear to have occurred in the same area, the Records Management Center.   (Docket Nos. 25 at ¶ 90; 34 at ¶¶ 90, 245-47).   Severyn was involved in both cases to some extent, although she had different roles.   As Coleman's supervisor, she imposed the discipline on Coleman.   (Def. Ex. J at 69; Pl. Ex. L).   In Epps' case, Severyn was a witness to her verbal assault and intimidation of co-worker Adams on November 19, 2009 and also was assigned to investigate the incident but discipline was determined by Mills and a group of other individuals.   (Docket Nos. 25 at ¶¶ 103-113, 116, 122; 34 at ¶¶ 103-113, 116, 122).   While a comparison between Epps' and Coleman's situations demonstrates some similarities, the

---

V.A.2. below, the evidence is not sufficient in this case to demonstrate that Laitres was biased toward Epps on the basis of her race such that her proffered "cat's paw" theory is not factually supported. *See Tucker v. Thomas Jefferson Univ.*, 484 F. App'x 710, 713 (3d Cir. 2012) (describing cat's paw theory).

[12]       The record is unclear to whom Severyn reported at the time of the events involving Coleman.   However, the burden lies with Epps to establish this fact as it is undoubtedly her burden to set forth evidence supporting her *prima facie* case.   *Jones*, 198 F.3d at 410-11.

evidence of record is not sufficient to demonstrate that they are similarly situated under prevailing Third Circuit law.   *See Mandel*, 706 F.3d at 170.

Further, a comparison of the behaviors engaged in by Epps and Coleman does not establish that they are as similar as Epps suggests.   Coleman's episode in the Records Management Center occurred on April 26, 2005 and is too remote in time from Epps' incident, which occurred more than *four and a half years later*, on November 19, 2009, to raise a reasonable inference of discrimination.   *See Newton-Haskoor v. Coface N. Am.*, Civ. A. No. 11-3931, 2012 WL 1813102 at *5 (D.N.J. May 17, 2012) ("it appears Plaintiff is trying to say that [comparator A], a male, engaged in bad behavior and was not disciplined while, Plaintiff, a female, engaged in bad behavior and was terminated. However, the nature of the parties' alleged behavior is too dissimilar and the time periods in which the behaviors occurred are too remote to conclude the two were "similarly situated" so as to permit the inference advanced by Plaintiff.").   Likewise, the incidents themselves were dissimilar in nature and not of "comparable seriousness."   *See Opsatnik v. Norfolk Southern Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) (holding that "while 'similarly situated' does not mean identically situated, purported comparators must have committed offenses of 'comparable seriousness'").

Coleman's behavior included being loud and using expletives during an argument with a co-worker.   (Docket No. 34 at ¶¶ 245-47).   He also "threw a book down" or "something like that," causing a disturbance for his co-worker and other employees in the Records Management Center.   (*Id.* at ¶ 247).   Meanwhile, the undisputed facts show that Epps, upset that she was not given a lamp that she was promised by a retired employee, engaged in a one-sided verbal assault aimed at co-worker Adams because she was displeased that Adams had recommended that another employee be able to use the lamp.   (Docket Nos. 25 at ¶¶ 133, 144; 34 at ¶¶ 133, 144).   Epps

cornered Adams against file cabinets in the Records Management Center and verbally assaulted her by screaming expletives in her face for a period of several minutes.   She admits that Adams was the victim, remained in a defensive position throughout the unprovoked attack and that several co-workers and supervisors were unable to stop the assault.   (*Id.* at ¶¶ 133, 144).   Epps' actions caused a major disturbance in the Records Management Center and drew the attention of security, AAD employees, numerous co-workers and supervisors to the scene.   (*Id.* at ¶¶ 114-115, 117). Looking at the context of the situations, the main differentiating factor between the severity of the incidents involving Epps and Coleman, is the directly intimidating nature of Epps' actions toward her victim Adams – by backing her up against a set of file cabinets and screaming in her face for a substantial period of time, Epps created an extremely threatening situation toward Adams, violated her personal space and engendered legitimate fear in her.   Her actions also prompted her co-workers to then file complaints against her and request that she be transferred to a job in another location because of their concerns for their own safety if Epps continued to work near them. (Docket Nos. 25 at ¶¶ 137-42; 34 at ¶¶ 137-42).    The facts of record describing Coleman's actions demonstrate that while he caused a disturbance in the Records Management Center, the situation simply did not rise to the level of the disturbance caused by Epps, create the same level of fear in the victim or result in numerous complaints from his co-workers, such that a reasonable jury could find that the two events were of "comparable seriousness."   *See Opsatnik*, 335 F. App'x at 223.

In all, the Court holds that Epps is not similarly situated to Coleman, Malloy or Adams. *See Mandel*, 706 F.3d at 170.   Given this finding, the Court's analysis of Plaintiff's *prima facie* case could end here.   However, the Court will continue its analysis for completeness.   *See Warfield*, 460 F. App'x at 130, n.3 ("Because we hold that Warfield did not offer evidence sufficient to establish a prima facie case of discrimination, we need not address arguments

regarding the remaining steps of the burden-shifting framework.).   To this end, even if the Court concluded that Epps was "similarly situated" to these comparators, Epps' claims fail because she has not met her burden to demonstrate that the comparators were treated more favorably by the company.

This second inquiry of whether the comparators were treated more favorably is focused on the criteria used by the employer in rendering its adverse employment action.   *See Simpson*, 142 F.3d at 647.   Epps argues that Coleman, Malloy and Allen all similarly violated the workplace violence policy but that she received much more significant discipline than the comparators for her similar violation of this policy.   (Docket Nos. 33, 39).   She is correct that the length of her one month suspension is more severe than the discipline imposed on the three comparators.   (Docket Nos. 25 at ¶¶ 129, 132; 34 at ¶¶ 129, 132, 246, 237, 240, 251).   But, Epps overlooks two very important aspects of her case which were not components of the discipline decisions for the alleged comparators.

First, Epps admits that her actions leading to her suspension violated two separate company policies –the workplace violence and anti-harassment policies –while the three identified Caucasian employees were found by the company to have violated only the workplace violence policy.   (Docket Nos. 25 at ¶¶ 129-30; 34 at ¶¶ 129-30, 245, 247, 237, 251).   Admittedly, there is some overlap in the conduct covered by these separate policies, but they also cover distinct types of conduct and a violation of one policy would not necessarily constitute a violation of the other. (Docket No. 31-2 at 11, n.3-4).   In this regard, the workplace violence policy proscribes employees from engaging in violent behavior, which is defined to include, "loud, angry or disruptive behavior" and "threats of violence."   (Docket No. 31-2 at 11, n.4).   On the other hand, the anti-harassment policy prohibits employee harassment based on protected qualities like race

and gender but also forbids the use of epithets, slurs, negative stereotyping, or threatening, intimidating, or hostile acts in the workplace.   (Docket No. 31-2 at 11, n.3).

Epps suggests that the discipline in her case was based only on her activities on November 19, 2009, and that she must have violated both policies as a result of her assault of Adams during the incident on that day.   (Docket Nos. 33, 39).   She relies on the suspension letter, which mentions only her actions on November 19, in support of this position.   (*Id.*).   However, Epps overlooks her actions on November 18, 2009 which were uncovered during the investigation of the November 19, 2009 incident and are undoubtedly related to her behavior on November 19. (Docket Nos. 25 at ¶¶ 90-2; 34 at ¶¶ 90-2).   The undisputed facts show that Epps began to outwardly display her complaints about the lamp situation to co-workers on November 18, 2009. (*Id.*).   She was overheard using expletives and loudly complaining about Adams to other employees.   (*Id.*).   Epps also admits that she went to the Records Management Center and shouted that she would be looking for Adams because she was "tired of her f'n fat white ass trying to control everything."   (*Id.* at ¶ 91).   Epps' use of a racial slur to describe Adams clearly violates the anti-harassment policy, which prohibits the use of epithets, slurs, and negative stereotyping in the workplace and racial harassment of co-workers.   (Docket No. 31-2 at 11, n.3).   There is no evidence of record that Coleman, Malloy or Allen made these types of racially charged comments at any time prior to the events which led to the decisions to terminate them.   In any event, the fact that the discipline imposed in Epps' case resulted from her violations of two separate company policies establishes that FENOC relied on different criteria in imposing discipline in her case as opposed to the situations involving the alleged comparators.   *See Warfield*, 460 F. App'x at 130. As the criteria used by FENOC during the decision-making processes for each of these individuals were different, Epps is unable to demonstrate that the comparators were treated more favorably.

38

*Id.*

Second, irrespective of any workplace discipline imposed by FENOC for Epps' conduct, including the 30-day suspension, her unescorted access was placed on hold immediately following the incident on November 19, 2009 and was not restored until March 15, 2010 – a time when her pay was also simultaneously reinstated.   (Docket Nos. 25 at ¶¶ 145, 157, 160; 34 at ¶¶ 145, 157, 160).   Epps concedes that FENOC policy provided that she could <u>not</u> maintain her position as a file and records clerk unless she had unescorted access authorization which enabled her to be present and work at the nuclear facility.   (Docket Nos. 25 at ¶¶ 14-18; 34 at ¶¶ 14-18).   Without this authorization, Epps simply could not have worked at the Shippingport plant in any capacity from November 19, 2009 through March 15, 2010.   (*Id.* at ¶ 18).   Epps has likewise admitted all of the relevant facts concerning the restoration process which was employed by the company in her case and which she successfully completed by March 15th.   (*Id.* at ¶¶ 143-156).   In this regard, she admits that the company was permitted to consider her entire employment disciplinary history, criminal record, medical history and past access history and that her entire checkered past – including multiple acts of harassment, criminal convictions for similar conduct, and prior instances of removal of unescorted access – was properly used by the AAD decision-makers who were tasked with evaluating whether she was fit to return to work.   (*Id.* at ¶¶ 35-52).   She has not alleged that she was discriminated against in any manner by FENOC in the administration of the unauthorized access restoration process, such as, the decision to place her access on hold immediately after the incident or any of the intervening decisions to continue to leave her access on hold for the entire period from November 19, 2009 to March 15, 2010.   (*See* Docket Nos. 33, 39).   Given these admissions, it is an undisputed fact that Epps could not have returned to work at any time prior to March 15, 2010, regardless of the length of any suspension imposed.

Epps has also not presented any evidence that the three chosen comparators were denied unescorted access authorization or found to not be fit for duty to work for any meaningful length of time relevant to the discipline cases against them.   (*See* Docket No. 34; Pl. Exs. A-N).   Initially, it is unclear if Allen was even subject to the same unescorted access standards as the employees reporting to the Shippingport plant while he was working at the Perry, Ohio location.[13]   Further, Epps has not pointed to any facts of record which would demonstrate that Coleman, Allen or Malloy either failed a fitness for duty test or had their unescorted access authorization placed on hold after the incidents within which they were involved.   (Docket Nos. 33, 39).   She merely points out that Coleman was not suspended and sent to anger management classes for his violation and that Malloy was suspended for one day as a result of his violation and submits that her thirty (30) day suspension was more severe.   (*Id.*).   She raises the same arguments with respect to Allen, who was not disciplined for his actions due to an allegedly insufficient investigation.   (*Id.*). Epps' position is unconvincing.   Because Epps cannot demonstrate that Malloy, Coleman or Allen lacked unescorted access authorization as she did, their situations are plainly dissimilar from her own and she is unable to establish that they were treated more favorably.   *See Warfield*, 460 F. App'x at 130.

Based on the foregoing analysis, the Court holds that there are no genuine disputes of material fact with respect to Epps' discrimination claims challenging the decision to issue a thirty-day suspension for her actions during the November 19, 2009 incident and that Epps has failed to present sufficient evidence to demonstrate a *prima facie* case of race discrimination.   *Id.*

---

[13]   The Court notes that it is likely that Allen was subject to the same requirements given that the Perry plant is also a nuclear facility and would be regulated by the NERC like the Shippingport facility.   However, it is not clear from the evidence of record, established through discovery in this case, that Epps and Allen were subject to these same access requirements.   *See Celotex Corp.*, 477 U.S. at 322; *see also* W.D.Pa. LCvR 56.C.1. (setting forth the requirements for oppositions to motion for summary judgment, including that any additional facts be described by the opposing party in separately numbered paragraphs in a responsive concise statement of material facts)

at 129-30.

        b.   FENOC's Legitimate Non-Discriminatory Reasons

     Assuming Epps had met her burden of production to establish a *prima facie* case of race discrimination, the burden would then shift to FENOC to articulate a legitimate, non-discriminatory reason for its decision to suspend Epps for her actions on November 19, 2009. *See Jones*, 198 F.3d at 410-11. The burden placed on an employer to articulate a legitimate non-discriminatory reason for its employment action is "relatively light." *Fuentes,* 32 F.3d at 763. Indeed, "[t]he employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." *Id.* at 763. FENOC easily satisfies its burden based on the undisputed facts of this case. The Court of Appeals has recognized that an employee's acts of violence or threats of violence against a co-worker are legitimate, non-discriminatory reasons for disciplining an employee. *See e.g., St. John v. Postmaster General of U.S.*, 474 F. App'x 80, 82 (3d Cir. 2012); *Exantus v. Harbor Bar & Brasserie Restaurant*, 386 F. App'x 352, 355 (3d Cir. 2010) (citing *Clark v. Runyan*, 218 F.3d 915, 918 (8th Cir. 2000)) ("Both actual violence against fellow employees and threats of violence are legitimate reasons for terminating an employee."). Likewise, an employee's violation of a company policy prohibiting workplace violence, threats of violence and harassment constitute a legitimate, non-discriminatory reason for disciplining the employee. *Money v. Provident Mutual Life Ins. Co.*, 189 F. App'x 114, 116 (3d Cir. 2006) (noting that violence engaged in by plaintiff in violation of company policy against violence and threats of violence were sufficient evidence to meet defendant's burden of production). Here, FENOC states that it suspended Epps due to her violation of the company's policies against workplace violence and harassment as a result of her conduct on November 19, 2009. (Docket

Nos. 25 at ¶¶ 129-32; 34 at ¶¶ 129-32).   Thus, considering the evidence of record, FENOC has

met its burden under *McDonnell Douglas* to proffer legitimate, non-discriminatory reasons for its

decision to suspend Epps.

        c.  Insufficient Evidence of Pretext

In order to overcome FENOC's proffered legitimate non-discriminatory reasons for its

adverse employment decision, the burden shifts to Epps to prove by a preponderance of the

evidence that such action was a pretext for discrimination.   *See Jones*, 198 F.3d at 410-11.   To

meet her burden, Epps "must point to some evidence, direct or circumstantial, from which a

factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or

(2) believe that an invidious discriminatory reason was more likely than not a motivating or

determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.

> The plaintiff can discredit the proffered reasons by "demonstrat[ing]
> such weaknesses, implausibilities, inconsistencies, incoherencies,
> or contradictions in the [defendant's] proffered legitimate reasons
> for its action that a reasonable factfinder could rationally find them
> unworthy of credence, and hence infer that the [defendant] did not
> act for the asserted non-discriminatory reasons." Alternatively, to
> show that discrimination was the likely cause of the adverse action,
> a plaintiff can show, for example, that the defendant had previously
> subjected the same plaintiff to "unlawful discriminatory treatment,"
> that it had "treated other, similarly situated persons not of his
> protected class more favorably," or that it had "discriminated
> against other members of his protected class or other protected
> categories of persons."

*Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 277 (3d Cir. 2010) (quoting *Fuentes*, 32 F.3d

at 764-65).   However, "the plaintiff's evidence rebutting the employer's proffered legitimate

reasons must allow a fact-finder reasonably to infer that each of the employer's proffered

non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate

the employment action (that is, that the proffered reason is a pretext)."   *Doe v. C.A.R.S. Protection*

*Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008) (citations omitted).   Given that the *prima facie* case and pretext inquiries often overlap, evidence supporting the *prima facie* case can be used to demonstrate pretext.   *Id.* (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000)).

In this Court's estimation, viewing the entirety of the evidence in the light most favorable to Epps, as this Court must, there are no genuine disputes of material fact and Epps has failed to adduce sufficient evidence from which a reasonable jury could conclude that the proffered non-discriminatory reasons for suspending Epps were a pretext for discrimination and unworthy of credence.

Epps relies exclusively on her comparator evidence in an effort to disprove FENOC's proffer that her suspension was the result of her violation of its workplace violence and anti-harassment policies.   (Docket Nos. 33, 39).   The evidence concerning comparators presented during the *prima facie* case is also relevant to the determination of whether the company's alleged disparate treatment of the comparators is sufficient to demonstrate pretext. *See Simpson*, 142 F.3d at 645-46.   However, Epps' burden is increased at the pretext stage and comparator evidence that may be sufficient to establish a *prima face* case is not necessarily sufficient to demonstrate pretext. *Id.* Instead, Epps must come forward with specific evidence showing that the comparators were treated more favorably in order to permit the inference that the discipline imposed in her case was discriminatory.   *Id.*   Further, "while evidence that one non-member of the protected class was allegedly treated more favorably than a member of the protected class may be enough at the prima facie case stage of the analysis, this showing is not enough to demonstrate pretext."   *Brooks v. USX Corp.*, Civ. A. No. 05-47, 2006 WL 2547342, at *8 (W.D. Pa. Aug. 31, 2006) (citing *Simpson*, 142 F.3d at 646).

43

For all of the reasons that the Court has already expressed with respect to her *prima facie* case, Epps has failed to point to evidence sufficient to demonstrate that there are any similarly situated employees who were treated more favorably by FENOC.   *See* § V.A.1.a., *supra*.   Simply put, Malloy, Coleman and Allen are not proper comparators.   As such, the less severe discipline imposed by FENOC in their situations does not raise an inference of discrimination which would undermine the decision to suspend Epps for her actions during the November 19, 2009 incident. Accordingly, the Court alternatively concludes that, even if Epps' evidence was adjudged sufficient to demonstrate a *prima facie* case of race discrimination, which it does not, such evidence would be insufficient to meet her burden to establish pretext.[14]  *See Simpson*, 142 F.3d at 645-46.

### d.   Conclusion as to November 19, 2009 Incident

For these reasons, the Court grants FENOC's motion for summary judgment as to Epps' race discrimination claims for the November 19, 2009 incident.

### 2.   Termination Resulting from April 19, 2010 Incident

The Court next finds that Epps has presented insufficient evidence to establish a *prima facie* case of race discrimination stemming from her termination for her conduct during the April 19, 2010 incident and, alternatively, even if a *prima facie* case was established, she has failed to meet her burden that FENOC's legitimate, non-discriminatory reason for her termination is a pretext for discrimination.

### a.   Insufficient Evidence to Establish Plaintiff's *Prima Facie* Case

The parties' primary dispute with respect to FENOC's termination of Epps again focuses

---

[14]     The Court notes that to the extent that Epps' additional pretext arguments addressed in the following section, V.A.2, were applied to her suspension, they would be rejected for the same reasons.

on whether the record evidence is sufficient to establish the fourth element of Epps' *prima facie* case. (Docket Nos. 33, 36, 39, 40).   Epps argues that the appropriate comparator for this adverse action is Coleman.   (Docket No. 33).   She points to Coleman's situation as analogous to hers because a few months after his initial violation of the workplace violence policy, Coleman committed a second violation of company policies.   (*Id.*).   She further contends that the discipline imposed by FENOC for her subsequent conduct, i.e., termination, was more severe than the discipline imposed for Coleman's second violation, as he was not terminated.   (*Id.*).   FENOC counters by once again pointing out the differences between the situations involving Coleman and Epps and arguing that they are not similarly situated for purposes of Epps' purported establishment of a *prima facie* case or pretext.   (Docket Nos. 36, 40).   The Court finds FENOC's arguments more persuasive.

The Court previously found that Epps and Coleman held different positions, had different supervisors and worked in different departments at the Shippingport plant at the time of their initial violations of the workplace violence policy.   *See* § V.A.1.a., *supra*.   The undisputed facts show that each of them remained in their prior positions when they committed a second violation of company policy and therefore, they still reported to different supervisors and continued to work in separate departments.   (Docket Nos. 25 at ¶¶ 13, 85; 34 at 13, 85; Def. Ex. J at 69).   As before, these fundamental differences between Epps and Coleman preclude the Court from finding that Epps has established her *prima facie* case.   *See Mandel*, 706 F.3d at 170. In addition, the second incidents involving Coleman and Epps occurred nearly four and a half years apart, which, like the timing between the initial violations committed by these two individuals, without more, is insufficient to raise a reasonable inference that the discipline imposed in Epps' case was the result of discrimination.   *See Newton-Haskoor*, 2012 WL 1813102 at *5.   To this end, Coleman's

second offense occurred on October 6, 2005 while Epps' second offense took place on April 19, 2010.  (Docket Nos. 25 at ¶¶ 177-199; 34 at ¶¶ 177-199, 248; Pl. Ex. M).   More importantly, however, are the facts of the two subsequent infractions committed by Coleman and Epps because these second violations were too dissimilar in nature to establish that these individuals are similarly situated under Third Circuit precedent.

The facts of his second offense show that Coleman was not suspended for his initial violation of the workplace violence policy and remained employed at FENOC after the April 26, 2005 incident.  (Docket No. 234 at ¶246).   Like Epps, Coleman was issued a warning letter by the company which set forth the details of his initial violation and further stated that "[t]his letter is to inform you that any future incidents of this nature or any other matter concerning your performance as an employee may result in further disciplinary action including, and up to, termination."   (Pl Ex. L).   The facts established through discovery show that Coleman failed a drug test on October 6, 2005, nearly six months after his first incident.   (Docket No. 234 at ¶248; Pl. Ex. M).   The discipline imposed on Coleman included that he was placed on non-occupational illness and injury leave on October 6, 2005 and, although the record is unclear, it appears that he returned to work on December 8, 2005.   (*Id.*).

Epps' second offense was unlike Coleman's because the record does not show that they "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."   *McCullers*, 427 F. App'x at 195. Epps simply did not engage in similar conduct to Coleman's failed drug test.   Instead, she violated the terms of the company's April 1, 2010 letter outlining the discipline imposed upon her for her first violation stemming from the November 19, 2009 incident and the company's expectations of her conduct going forward, by starting another inappropriate workplace confrontation with a

co-worker almost immediately after her return to work full-time from her suspension.   *See discussion* at § V.A.1, *supra*.

The April 1, 2010 letter clearly and concisely described that Epps' conduct on November 19, 2009 was unacceptable, created an intimidating workplace environment and violated company policies against workplace violence and harassment.   (Docket No. 25 at ¶¶ 162-63;  34 at ¶¶ 162-63).   Epps was also advised that similar conduct would not be tolerated in the future, that she was expected to act professionally at all times, be respectful of her co-workers and be cooperative. (*Id.*).   She was further told in no uncertain terms that if she failed to adhere to the requirements of the letter, she could be suspended or terminated immediately.   (*Id.*).   Epps was read the letter at a meeting with her supervisor, Mills, and H.R. representative Laitres on April 1.   (Docket Nos. 25 at ¶¶ 162-63; 34 at ¶¶ 162-63).   A union representative was also present for Epps' benefit.   (*Id.*). She asked no questions and indicated that she understood the company's expectations of her, as set forth in the letter.   (*Id.* at ¶165).

Despite the terms of the letter and the meeting wherein she was advised of same, Epps engaged in conduct which the company determined violated the letter on the *third day* after she physically returned to work from her suspension by starting a verbal confrontation with another co-worker, Zupo, on April 19, 2010.[15]   (Docket Nos. 25 at ¶¶ 181-91; 34 at ¶¶ 181-91).   The facts of record bear out that Epps left her work area, at a time she was supposed to be working or at least conferring with her union representative about her tardiness for work, in order to go to another area of the facility to question Zupo about their personal relationship.   (*Id.* at ¶¶ 180-82).   Epps did so

---

[15]      The Court notes that Epps was off work for various reasons from April 1, 2010 through April 19, 2010 and the only full day that she worked in this time period was April 14, 2010.   (Docket Nos. 25 at ¶¶ 161, 167, 170-76; 34 at ¶¶ 161, 167, 170-76).   She worked a half day on April 1, 2010 and a portion of April 19, 2010 until she initiated the incident at issue.   (*Id.* at ¶¶ 161, 177-78, 198).

because she was upset that Zupo had not called her while she was on suspension and no longer believed that Zupo should hang pictures of Epps' family and dog in her cubicle.   (*Id.* at ¶ 182). Epps' union representative, Thomas, accompanied her to Zupo's work area at her request and to facilitate this conversation.   (*Id.* at ¶¶ 181-82).

The facts surrounding the exchange between Zupo and Epps are somewhat disputed, although there are no genuine disputes of material facts which would preclude the entry of summary judgment for Defendant.   *See Anderson*, 477 U.S. at 248 ("[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").   Epps admits that some type of argument ensued and that she had grabbed a picture from Zupo's wall, tore it up in front of her and threw it away.   (Docket Nos. 25 at ¶¶ 189-90; 34 at ¶¶ 189-90).   The parties dispute whether Epps yelled loudly or was profane during the verbal exchange between her and Zupo and if she had permission to take the picture. (*Id.*).   Defendant points to its evidence that Zupo's immediate report to her supervisor, Severyn, was that she was very upset, that Epps had yelled at her, and then tore up the picture in front of her; Thomas' corroboration of these events, as well as the reports of other employees near the scene. (Docket Nos. 25 at ¶¶ 200-07, 210-13; 34 at ¶¶ 200-07, 210-13; 26-7). Epps attempts to downplay the seriousness of this incident in an effort to buttress her case by pointing to an email Zupo sent to company representatives a few days later wherein she asks that Epps not be terminated as a result of the incident, which she suggests undermines the company's position.   (Docket No. 35-11).

In this Court's estimation, this purported dispute goes more to the alleged severity of the incident and bears on the determinations of whether Epps actually violated the terms of the April 1, 2010 letter and was then appropriately disciplined for violating same.   But, this dispute is immaterial because such evidence does not support Epps' *prima facie* case of race discrimination.

48

*See Money*, 189 F. App'x at 117 (citing *Fuentes*, 32 F.3d at 765) (holding that even if the employer's "decision was imprudent, unwise and incompetent, a merely bad employment decision is not actionable under Title VII."). Indeed, resolution of these facts would not change the legal determination that Epps and Coleman engaged in completely different conduct, i.e., a failed drug test versus a second confrontation with a co-worker, and thus, cannot be similarly situated under either party's version of the events. *See McCullers*, 427 F. App'x at 195. While Epps may be able to prove that FENOC's decision to terminate her was unwise or even incorrect, such evidence by itself is insufficient to establish that the termination was the result of race discrimination. *See Money*, 189 F. App'x at 117; *see also Fuentes*, 32 F.3d at 765.

On this record, Epps is also unable to establish that Coleman was treated more favorably than she as the criteria used by the company to impose discipline in both cases were distinct. The letter issued to Coleman warned him that "any future incidents" of a similar nature to his initial violation of the workplace violence policy "or any other matter concerning your performance as an employee may result in further disciplinary action including, and up to, termination." (Pl. Ex. L.). Of course, Coleman's second violation was not similar in nature to his first violation. (Docket No. 34 at ¶¶ 245-50; Pl Exs. L, M). Again, Coleman failed a drug test and thereby was determined to be unfit for duty under the company policies covering random drug and alcohol screenings and fitness for duty. (*Id.*). In contrast, Epps' inappropriate confrontation with Zupo – although admittedly not as severe as the prior incident with Adams – was similar in nature to that initial violation, which involved a verbal confrontation with a coworker and conduct which created an intimidating work environment. (Docket Nos. 25 at ¶¶ 133, 144; 34 at ¶¶ 133, 144). The company therefore determined that Epps' actions in the Zupo incident contravened the specific terms of the April 1, 2010 letter issued to her while Coleman's second disciplinary event involved

49

an entirely separate matter from his first.

In all, the Court finds that the record evidence, viewed in light most favorably to Epps, is not sufficient for a reasonable fact finder to conclude that she was similarly situated to Coleman and that he was treated more favorably.   *See Warfield*, 460 F. App'x at 129-30.

      b.   FENOC's Legitimate Non-Discriminatory Reason for Termination

Assuming that Epps had presented sufficient evidence to establish a *prima facie* case of race discrimination resulting from her termination, the next step in the analysis would be to evaluate whether FENOC has set forth a legitimate, non-discriminatory reason for its employment decision.   *See Jones*, 198 F.3d at 410-11.   Clearly, inappropriate workplace behavior by an employee is a legitimate non-discriminatory reason for an employer to discipline an employee. *See Kimble v. Morgan Properties*, 241 F. App'x 895, 898 (3d Cir. 2007) (noting that inappropriate behavior toward tenants was legitimate non-discriminatory reason for termination); *see also Ozlek v. Potter*, 259 F. App'x 417, 422 (3d Cir. 2007) (stating that employee's inappropriate behavior was sufficient for employer to meet its burden on summary judgment).   Here, FENOC meets its burden under *McDonnell Douglas* because it has proffered that Epps was terminated due to her having engaged in an "inappropriate, aggressive confrontation with a co-worker," in violation of the April 1, 2010 letter.   (Docket Nos. 25 at ¶ 219; 34 at ¶¶ 219, 252).   Therefore, the burden shifts back to Epps to establish pretext.   *See Jones*, 198 F.3d at 410-11.

      c.   Insufficient Evidence of Pretext

Unlike her case challenging her suspension, Epps has set forth a number of arguments in support of position that the decision to terminate her was a pretext for race discrimination. (Docket No. 33 at 14-15).   She argues all of the following: (1) that Coleman was similarly situated to her and treated more favorably; (2) that Laitres failed to interview her during FENOC's

investigation of her conduct; (3) that the decision to terminate her was made without considering the email from Zupo wherein she purportedly states that no argument occurred during the incident; (4) that she was not found to be in violation of the workplace violence policy; (5) that the evidence shows discriminatory animus on behalf of Laitres and that such animus should be imputed to the company under the "cat's paw" theory; and, (6) that FENOC has proffered several, inconsistent reasons for its termination decision, evidencing that the true reason was discrimination. (*Id.*; *see also* Docket No. 38). While the Court has found that Epps has not met her burden to establish a *prima facie* case, it will briefly discuss this evidence, which the Court also finds does not support her case asserting pretext.

First, as is discussed in the preceding sections, Coleman is not similarly situated to Epps for all of the reasons set forth herein. *See* §§ V.A.1.a., V.A.2.a., *supra*. No further elaboration of this point is necessary.

Second, it is well-recognized that the fact that a company conducted an inadequate investigation of employee misconduct or failed to interview an employee during an internal investigation, without more, is not sufficient to raise an inference of discrimination. *See Geddis v. University of Delaware*, 40 F. App'x 650, 653 (3d Cir. 2002) (finding that an inadequate investigation is not sufficient to demonstrate pretext and that employer acted with discriminatory animus); *see also Glenn v. Raymour and Flanigan*, 832 F. Supp. 2d 539, 553 (E.D. Pa. Dec. 22, 2011) (rejecting plaintiff's contention that the fact that the company did not formally interview him demonstrated pretext). In any event, the facts show that Epps was not wholly foreclosed from participating in the company's investigation as she advocates. Indeed, both Epps and her union representative, Thomas, met with her supervisor Mills immediately following the incident and then Mills shared her version of the occurrence with Laitres. (Docket Nos. 25 at ¶¶193-97; 34

at ¶¶ 193-97).   Thomas was also subsequently interviewed by Laitres.   (*Id.* at ¶¶ 200-07).

Accordingly, the fact that Laitres did not personally interview Epps to hear her side of the events in

question is insufficient to demonstrate pretext because Epps was plainly provided an opportunity

to discuss her case with her supervisor and the information she provided to him became a part of

the investigation.   *See Glenn*, 832 F. Supp. 2d at 553.

Third, as FENOC points out, the decision to terminate Epps was made before Zupo even

sent the April 23, 2010 email requesting leniency for Epps and asking that she not be terminated.

(Docket No. 40).   In fact, Epps' supervisor, Mills, had presented the case for Epps' termination to

the SCWERT team the day before Zupo's email was sent.   (Docket Nos. 25 at ¶ 217; 34 at ¶ 217;

Mills Depo at 128-29).   As the cogs of the company's decision-making machinery were already in

motion and the decision to terminate Epps had been made, this later submitted evidence, from a

non-supervisory employee with no decision-making capacity, cannot establish pretext.   *See Clark*

*Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously

planned [employment decisions] upon discovering that a Title VII suit has been filed, and their

proceeding along lines previously contemplated, though not yet definitively determined, is no

evidence whatever of causality.").

Fourth, the fact that the company did not determine whether Epps violated the workplace

violence policy or not is of no moment because the company determined that she acted

inappropriately at work and thereby violated the terms of the April 1, 2010 letter, prompting her

termination.   *See Ozlek*, 259 F. App'x at 422.   Further, Epps points to no evidence in the record

which suggests that FENOC violated the CBA or any of its own policies by imposing discipline in

this manner.   (Docket Nos. 33, 39).   While Epps surmises that no other employees were subject

to the same level of scrutiny as she was under the April 1, 2010 letter, the record demonstrates

otherwise.  (*Id.*).   To this end, the letter issued to Coleman after his initial violation of the workplace violence policy contains the same general tenor and warning that he would have potentially been subject to termination if he committed any similar acts in the future but he simply did not commit that type of act for his second violation.   (Pl Ex. L. ("This letter is to inform you that any future incidents of this nature or any other matter concerning your performance as an employee may result in further disciplinary action including, and up to, termination.")).   Epps also admits that the company used its standard procedure by employing the SCWERT team review of the recommended discipline put forth by Mills, Brosi and Laitres such that the disciplinary decision was approved by a group of individuals who were not in the line of supervisory command above her within the company's organizational hierarchy.   (Docket Nos.25 at ¶¶ 130-32; 34 at ¶¶ 130-32; Docket No. 26-5 at 99).

Fifth, the asserted "cat's paw" theory has no application in this case because there is insufficient evidence that Laitres exhibited discriminatory animus toward Epps to demonstrate pretext on this basis.   "The subordinate bias, or 'cat's paw,' theory states that an employer is liable for race discrimination when a nonbiased decision-maker is influenced by a biased managerial employee."  *Tucker v. Thomas Jefferson Univ.*, 484 F. App'x 710, 713 (3d Cir. 2012) (citing *Staub v. Proctor Hosp.*, —— U.S. ——, 131 S.Ct. 1186, 1193–94 (2011)).   The purported animus asserted by Epps relies on Laitres' involvement in the discipline decisions in her case as well as the instances of discipline imposed by the company on the three comparator employees.   (Docket Nos. 33, 38).   Just as this comparator evidence is insufficient to infer discriminatory animus on behalf of the company, it is inadequate to demonstrate that Laitres herself possessed such discriminatory animus toward Epps.   There is no other evidence in this record of racial bias by Laitres against Epps or any other employee which could be inferred to the other decision-makers,

i.e., Epps' supervisor, Mills; his boss, Brosi; or the SCWERT review team. Accordingly, the "cat's paw" theory is not factually supported in this case. *See Tucker,* 484 F. App'x at 713.

Sixth, the Court rejects Epps' suggestion that the company has offered inconsistent reasons for her termination by pointing to the termination letter she received and the company's later filings in this lawsuit, primarily its brief in support of its motion for summary judgment. (*See* Docket No. 33). Epps has not pointed to any earlier instances of supposed inconsistencies in the company's reasons for terminating her, such as, for example, a letter or email communication from a company official, any other documentary evidence, witness testimony in this case or her grievance hearing, or any of the other filings in this lawsuit. (*Id.*). Without more, the manner in which FENOC's lawyers have characterized the reasons for terminating her in their brief filed two and a half years after her termination is not sufficient to show that the company's earlier decision to terminate her should be unworthy of credence or to infer that the true reason for the decision was race discrimination. *See Anderson,* 621 F.3d at 277.

In all, the Court concludes that Epps has not put forth evidence "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in FENOC's reasons for its decision to terminate her for violating the April 1, 2010 letter such that "a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the [defendant] did not act for the asserted non-discriminatory reasons." *Anderson,* 621 F.3d at 277 (quoting *Fuentes,* 32 F.3d at 764-65).

> d.  Conclusion

For these reasons, summary judgment will be entered in favor of Defendant and against Epps regarding her race discrimination claims challenging her termination.

> 3.  <u>Conclusion on Discrimination Claims</u>

In this Court's opinion, there are no genuine disputes as to material facts and Epps has failed to present sufficient evidence to establish a *prima facie* case of race discrimination regarding her suspension in 2009 or termination in 2010 and, alternatively, has not presented sufficient evidence from which a reasonable factfinder could determine that the FENOC's proffered reasons for these employment decisions were a pretext for race discrimination.   *See Jones*, 198 F.3d at 410-11.   Epps has likewise failed to pursue her claims as pled in her Complaint that she was discriminated against by FENOC's refusal to reinstate her to work after her medical leave in 2008 and has not opposed FENOC's motion for summary judgment challenging these claims.   (Docket No. 33 at n.4).   Accordingly, the Court will enter summary judgment on behalf of FENOC and against Epps on all of her race discrimination claims under Title VII and the PHRA.

B.      *Retaliation Claims*

The Court now turns to the sufficiency of the evidence as to Epps' retaliation claims.   The *McDonnell Douglas* burden shifting framework is also applied to analyze retaliation claims under Title VII and the PHRA.   *See McDonnell Douglas*, 411 U.S. at 802-03; *see also Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006) (applying framework to a retaliation claim).   As with her discrimination claims, Epps has the initial burden to present evidence of a *prima facie* case of retaliation.   *Moore*, 461 F3d. at 341-42.   To establish a *prima facie* case of retaliation under Title VII[16] and the PHRA,[17] Epps must prove that: (1) she engaged in protected activity; (2)

---

16      42 U.S.C. § 2000e-3, titled "Other unlawful employment practices," provides:

(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings. It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for

the employer took a materially adverse action against her; and, (3) there was a causal connection between the protected activity and the employer's action. *LeBoon v. Lancaster Jewish Comm. Cent. Ass'n*, 503 F.3d 217, 231-32 (3d Cir. 2007) (citing *Moore*, 461 F.3d at 341-42). If Epps presents sufficient evidence to support a *prima facie* case of retaliation, the burden shifts to FENOC to articulate a legitimate, non-discriminatory reason for its employment decision, and if that is accomplished, the burden returns to Epps to demonstrate that the reason proffered by her employer is merely a pretext for discrimination. *Moore*, 461 F3d. at 341-42.

Here, the parties do not generally dispute that Epps has presented sufficient evidence to establish the first two elements of her *prima facie* case. (*See* Docket Nos. 28, 33, 36, 39, 40). To this end, Epps engaged in protected activity by filing a charge against FENOC alleging race discrimination in June of 2008 with the PHRC. (Docket No. 25 at ¶ 220; 34 at ¶ 220). Epps has also suffered adverse employment actions, i.e., her 2009 suspension and 2010 termination. (Docket Nos. 25 at ¶¶ 129-32, 219; 34 at ¶¶ 129-32, 219, 252). The main issue in dispute is therefore whether the evidence is sufficient to demonstrate a causal connection between Epps' filing of her charge of discrimination against FENOC in June of 2008 and her later suspension in November of 2009 and ultimately, her termination in April of 2010.

Before resolving the merits of the parties' positions on this issue, the Court first must

---

membership, because he has opposed any practice made an unlawful employment practice by this title [42 U.S.C. §§ 2000e to 2000e-17], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title [42 U.S.C. §§ 2000e to 2000e-17].

42 U.S.C. § 2000e-3(a).

[17]     The PHRA anti-retaliation provision provides that it shall be an "unlawful discriminatory practice" "[f]or any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden [thereunder], or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing [thereunder]." 43 Pa.C.S. § 955(d).

address the scope of the protected activity engaged in by Epps.   As noted, she relies on her filing

of a charge of discrimination with the PHRC on June 24, 2008 to establish the first element of her

retaliation case.   (Docket Nos. 25 at ¶ 220; 34 at ¶ 220).     This charge was not formally acted

on by the PHRC until it was dismissed on May 13, 2011.   (*Id.* at ¶ 223).   Epps argues that she

was "participating" in the PHRC proceeding for the entire duration of the time that her charge was

pending before the PHRC.   (Docket No. 33).   FENOC admits that "participation in proceedings"

may constitute protected activity under 42 U.S.C. § 2000e-3(a) but counters that an ongoing

investigation by the agency of a previously filed claim is not enough to demonstrate that Epps was

continually participating in protected activities before the PHRC.   (Docket No. 36).

       In this Court's opinion, FENOC is both legally and factually correct.   Title VII's

anti-retaliation provision protects employees from retaliation by their employers for engaging in

certain activities, including both participating in formal proceedings covered by Title VII and for

opposing certain employment practices.[18]  *See Slagle v. County of Clarion*, 435 F.3d 262, 266 (3d

Cir. 2006) (noting the differences between the "participation" and "opposition" clauses).

Relevant here, the "participation clause" of § 2000e-(3)(a) prohibits retaliation against an

employee who has "made a charge, testified, assisted, **or** participated in any manner in an

investigation, proceeding, or hearing under" Title VII.   42 U.S.C. § 2000e-(3)(a) (emphasis

added).   The plain language of this statute provides that the acts of filling charges of

discrimination, testifying, assisting and participating in proceedings related to that charge in any

manner constitute *distinct activities* which are all separately protected under the act.   *Id.*; *see also*

*Slagle*, 435 F.3d at 266 (holding that an employee filing a charge of discrimination alleging

---

[18]       Plaintiff has not pled or otherwise argued that she engaged in any protected activities under the "opposition clause."   (*See* Docket No. 1).   Accordingly, no further discussion of the scope or applicability of potential claims under the opposition clause is necessary for the resolution of this matter.

discrimination on the basis of race, color, sex, religion or national origin is protected under §
2000e-(3)(a)).   In addition, while the filing of a charge of discrimination is a necessary
prerequisite to a plaintiff stating a *prima facie* case that she engaged in protected activities by
virtue of her participation in related proceedings, the mere fact that a charge of discrimination is
filed and remains pending before the agency – without some additional proof that the plaintiff took
any further actions to "participate" in those proceedings – does not constitute a separate, protected
activity under the law.   *See Hubbell v. World Kitchen, LLC*, 688 F. Supp. 2d 401, 440 (W.D. Pa.
2010) (citing *Abbott v. Crown Motor Co.*, 348 F.3d 537, 543 (6th Cir. 2003)) ("The pendency of an
EEOC charge, and a resulting 'investigation, proceeding, or hearing' under Title VII, is a
prerequisite to the application of the participation clause."). Further, it is well established that
actions taken by the administrative agency, including issuing a right-to-sue letter or declining to do
so, cannot constitute protected activity under the anti-retaliation provision.   *See Clark Cnty Sch.
Dist.*, 532 U.S. at 273 (rejecting the "utterly implausible suggestion that the *EEOC's* issuance of a
right-to-sue letter—an action in which the employee takes no part—is a protected activity of the
employee") (emphasis in original).

Here, the record demonstrates that Epps engaged in protected activity by filing a charge
with the PHRC in June of 2008.   (Docket Nos. 25 at ¶ 220; 34 at ¶ 220).   The charge remained
pending before the PHRC until May of 2011 and that agency may have been investigating the
charge until that time.   (*Id.* at ¶ 223).   However, the focus of a participation clause claim must be
on Epps' actions and FENOC's awareness of those actions, *see Clark Cnty. Sch. Dist.*, 532 U.S. at
273, and there is no evidence of record that FENOC was aware of further actions taken by Epps
herself, if any, to "participate" in the proceedings after she filed her charge.   Further, the facts that
FENOC, and its H.R. representative, Laitres, were aware that the charge was pending and that

Laitres compiled documents in order to respond to the charge are not sufficient to support a retaliation claim under the participation clause. *Id.* Accordingly, Epps' claim is appropriately limited to her argument that she was retaliated against for engaging in protected activity by filing the charge with the PHRC in June of 2008.

With that clarification, the Court turns to the issue of causation. In order to show causation, "a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). The Third Circuit has recognized that a three-month gap between the protected activity and the adverse action cannot, without more, create an inference of causation for summary judgment purposes. *LeBoon v. Lancaster Jewish Community Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (citing *Clark Cnty. Sch. Dist.*, 532 U.S. at 273). Following this reasoning, this Court has concluded that intervening periods of two or three months, *see Urbanic v. Donahue*, Civ. A. No. 11-805, Docket No. 46 at 11 (W.D. Pa. Mar. 19, 2013), and five months, *see Lamarca v. Verizon* Pa., Inc., Civ. A. No. 09-203, 2010 WL 2044627, at *9 (W.D. Pa. May 20, 2010), were insufficient to establish suggestive temporal proximity. Here, the evidence is likewise deficient to show that the timing between the events alone can be used to support Epps' *prima facie* case because the charge she filed with the PHRA was made nearly a year and half before the suspension and almost two full years before the termination. (Docket Nos. 25 at ¶¶ 129-32, 219-20; 34 at ¶¶ 129-32, 219-20, 252).

Although there is a lack of temporal proximity in this case, the Third Circuit permits the use of "circumstantial evidence of a 'pattern of antagonism' following the protected conduct" to raise an inference of causation. *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir.

59

1997) (quoting *Robinson v. Southwestern Pa. Transp. Auth.*, 982 F.2d 892, 895 (3d Cir. 1993)). Furthermore, "the proffered evidence, looked at as a whole, may suffice to raise the inference" to establish causation. *Id.* (citation omitted). "Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for [the adverse action], or any other evidence in the record sufficient to support the inference of retaliatory animus." *LeBoon*, 503 F.3d at 232-33.

Having viewed the record evidence as a whole, and resolved all potential conflicts in the evidence in Epps' favor, the Court finds that the record does not support a causal inference that the decisions to suspend Epps for her actions in the November 19, 2009 incident and later terminate her for her actions on April 19, 2010 were made by FENOC as retaliation for her having invoked her rights by filing her charge of discrimination with the PHRC in June of 2008. *See id.*

The dispute between Epps and FENOC which led to her filing of the discrimination charge surrounded her ability to return to work from a lengthy medical leave in 2007 and 2008. (Docket Nos. 25 at ¶¶ 53-85; 34 at ¶¶ 53-85). Epps' physicians had prescribed several work-related limitations which she believed precluded her from performing her former position as a tool room attendant in the tool room, including that she not work around many people and have limited, if any, customer service responsibilities. (*Id.* at ¶¶ 56, 60, 69, 71, 73, 76, 79). Epps asked for an accommodation from FENOC but her request was denied on the basis that there were no comparable positions within the company which had the type of duties she requested in light of her limitations. (*Id.* at ¶¶ 63-67). FENOC suggested that Epps bid into another position with such duties but Epps refused because the other position was a lesser paying job than she previously held. (*Id.* at ¶ 66). In her discrimination charge, Epps alleged that FENOC had treated certain white employees with medical restrictions more favorably and accommodated them by returning

them to work in other positions.   (Docket Nos. 25 at ¶ 220; 34 at ¶ 220).

The record shows that the parties remained in an effective stalemate over this dispute for some time as Epps continued to seek medical advice and refused to return to work without the requested accommodations and FENOC maintained its position that it was unable to accommodate her.   (*Id.* at ¶¶ 66-72).   However, the impasse ended when Epps was medically cleared to return to work full time and did so on February 6, 2009.   (Docket Nos. 25 at ¶ 84; 34 at ¶ 84).   Shortly thereafter, on March 2, 2009, she successfully bid into a position as a file and records clerk in the Procedural Control Unit.   (*Id.* at ¶ 85).   The facts established through discovery reveal that nothing of significance occurred between February 6, 2009 and the November 19, 2009 incident for which she was suspended.   (*See* Docket Nos. 25, 34).   To this end, she has neither alleged nor presented any evidence showing that FENOC discriminated against her during that time, interfered with her job duties, antagonized her or otherwise retaliated against her.   (*See* Docket Nos. 33, 34, Pl. Ex. A-L).   There is likewise no evidence of any disputes between Plaintiff and FENOC concerning Epps' pay, benefits, work performance, duties, hours or any other issues concerning her employment.   (*Id.*).   Without any such evidence to the contrary, it appears to the Court that Epps simply reported to work and adequately performed her duties for that entire nine-month period and that FENOC was satisfied with her performance and workplace behavior.

In short, the evidence of record is not sufficient to infer that the adverse employment decisions in November of 2009 and April of 2010 were made by FENOC as retaliation for her filing the charge in June of 2008.   While there is some evidence of disputes between the parties in the months immediately following her filing of the charge, the nine-month period of apparent calm which preceded the challenged employment actions in this case precludes a reasonable jury from concluding that such actions were taken to retaliate against Epps.   *See Hussein v. UPMC Mercy*

*Hosp.*, 466 F. App'x 108, 11-113, n.4 (3d Cir. 2012) (noting that evidence was insufficient to demonstrate retaliation for protective activities engaged in more than a year before the adverse employment actions).   As the Court has already fully explained above, Epps has failed to persuade this Court that she is similarly situated to her chosen comparators.   *See* §§ V.A.1.a., V.A.2.a., *supra*.   Such evidence likewise does not support an inference that the discipline imposed in her case was retaliatory.   *See id.*   Further, the proffered evidence, as a whole, is insufficient to support an inference of retaliatory animus on behalf of FENOC.   *See Kachmar*, 109 F.3d at 177.   In all, the Court finds that Epps has not proved a *prima facie* case of retaliation.

The parties have not presented the Court with any additional arguments concerning the remaining steps in the *McDonnell Douglas* burden shifting framework as applied to Epps' retaliation claims other than those that have already been fully addressed by the Court in conjunction with her discrimination claims.   (Docket Nos. 28, 33, 36, 39, 40).   The Court agrees with the parties that the evaluation of the evidence under *McDonnell Douglas* is very similar with respect to the discrimination and retaliation claims because she is challenging the same two adverse employment decisions in all of her claims.   As such, the Court hereby adopts its preceding discussion, (*see* §§ V.A.1.b-c, V.A.2.b-c, *supra*), and holds alternatively, that if the evidence can be deemed sufficient to prove a *prima facie* case of retaliation, FENOC has met its burden in providing legitimate, non-discriminatory reasons for its suspension and termination decisions and Epps has not met her burden to show that these decisions were pretextual.   *See Moore*, 461 F3d. at 341-42.

For these reasons, the Court holds that there are no genuine disputes of material fact and that FENOC is entitled to summary judgment on Epps' retaliation claims.

VI.     CONCLUSION

Based on the foregoing, FENOC's motion for summary judgment [23] is granted.   An appropriate Order follows.

                                        *s/Nora Barry Fischer*
                                        Nora Barry Fischer
                                        United States District Judge


Date:   March 25, 2013

cc/ecf:  All counsel of record.